479 So.2d 891 (1985)
Ulmer G. WILSON
v.
The CITY OF NEW ORLEANS.
No. 85-C-0712.
Supreme Court of Louisiana.
December 2, 1985.
*893 Guy E. Wall, Alan H. Katz, Gordon, Arata, McCollam, Stuart & Duplantis, New Orleans, for plaintiff-applicant.
Salvador Anzelmo, City Atty., Thomas Milliner, Asst. City Atty., for defendant-respondent.
DENNIS, Justice.
The issue in this case is whether the Due Process Clauses of the United States and Louisiana Constitutions require that a city's selection of vehicles to be immobilized for excessive parking tickets be approved by a neutral disinterested decision maker, and that prior to final issuance of an order to "boot" a vehicle, its owner be afforded notice with a summary of the adverse evidence and an opportunity to make an informal statement to a deciding officer regarding whether proper grounds exist for booting his vehicle.

1.
Upon returning to his legally parked vehicle on a New Orleans street, relator Ulmer G. Wilson discovered that it had been immobilized by city employees with a device commonly known as a "boot." A placard affixed to the car's window informed Wilson that he should call a designated phone number for information on releasing the vehicle. When he called, he was informed that he must pay $630 for previous parking violations plus a $30 boot fee to have the device removed. Wilson went to the Violations Branch and was told that he could also free his car by posting a cash bond in the same amount. He offered to post a property bond, and tendered his attorney's check in the required amount, but these offers were refused. Two days later city employees removed the car from the street and placed it in storage.
Wilson brought an action against the city seeking (1) a temporary restraining order releasing his automobile and preventing further immobilization, (2) a preliminary injunction to the same effect, and (3) a permanent injunction and damages. The case was consolidated with Roland Safe & Lock Co. v. City of New Orleans, and the claim for damages was severed. The Roland suit was not appealed, and is not before this court. The district court signed a temporary restraining order releasing the vehicle, but subsequently denied preliminary and permanent injunctions, upholding the constitutionality of the ordinances. At trial Wilson admitted that at least twenty parking tickets had been affixed to the windshield of his car during the year preceding its immobilization and that he failed to contest any of the tickets or to pay the penalties. It is undisputed that each New Orleans parking ticket contains a statement on its back that immobilization may result from failure to pay a ticket or to request a hearing. It is also uncontroverted that the determination to declare Wilson's car a target for booting was made by a private corporation employed by the city to collect parking fines, and that Wilson was not given notice of the immobilization order or an opportunity to question or contest the immobilization order prior to the booting of his car. The trial court concluded that the procedure established by the city complies with the requirements of due process and dismissed Wilson's suit.
*894 Wilson appealed, and the Court of Appeal affirmed, 466 So.2d 726 (La.App.4th Cir.1985), holding that the city's booting procedure does not violate due process guarantees.

2.

A. Basic Principles
Due process of law is guaranteed by both the Fourteenth Amendment to the United States Constitution and Art. 1, § 2 of the 1974 Louisiana Constitution. The central meaning of procedural due process is well settled: Persons whose rights may be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified. Baldwin v. Hale, 1 Wall. 223, 17 L.Ed. 531 (1864). It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).
The Constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions. The purpose of this requirement is to protect a person's use and possession of property from arbitrary encroachmentto minimize substantially unfair or mistaken deprivations of property. Fuentes v. Shevin, supra; see Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). Fairness can rarely be obtained by a secret, one-sided determination of facts decisive of rights, and no better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 170-71, 71 S.Ct. 624, 647-48, 95 L.Ed. 817, 853 (1951) (Frankfurter, J., concurring).
Any significant taking of property by the State is within the purview of the Due Process Clause. Fuentes v. Shevin, supra. Even a temporary, nonfinal deprivation of property is nonetheless a "deprivation" within the contemplation of the Fourteenth Amendment. Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).
To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense on the merits. Coe v. Armour Fertilizer Works, 237 U.S. 413, 35 S.Ct. 625, 59 L.Ed. 1027 (1915). It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing may be. Fuentes v. Shevin, supra.
Due process is not a technical concept with a fixed content unrelated to time, place and circumstance. Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Due process is flexible and calls for such procedural protections as the particular situation demands. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Accordingly, whether the procedure by which a person is deprived of his property interest is constitutionally sufficient requires analysis of the governmental and private interests that are affected. Arnett v. Kennedy, 416 U.S. 134, 167-68, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Cafeteria Workers v. McElroy, supra.
The Fourteenth Amendment protects the citizen against the state itself and all of its creatures. Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); West Virginia Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

B. What Process is Due?
The City concedes that plaintiff's property interest was protected by due process, *895 but argues that he was afforded all of the process which he was due. "Process" is not a term with a clear definition, and the nature of the procedure required to comply with the due process clauses depends on many factors concerning the individual deprivation. Nowak, Rotunda & Young, Constitutional Law (1978), at 498. A brief review of the principles which the United States Supreme Court has developed in determining the adequacy of a procedure will help in our analysis of the process and the deprivation in this case.
If there is a deprivation of life, liberty or property which is based on disputed facts or issues, the individual whose interests are affected must be granted a fair procedure before a fair decision maker. However, this principle does not mean that the individual always has the right to a hearing before action is taken, or even to a personal hearing at any time. What is required is a procedure, not necessarily a hearing. In many of the cases where the Court has found that there is a deprivation, it has required that the individual be granted a personal hearing prior to the government action. See, e.g., Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (terminating basic welfare benefits); cf. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (preliminary hearing at place of arrest for parole violation). However, in some cases the Court has held that hearings which take place after the government action, when combined with other safeguards, will suffice. See e.g., North Georgia Finishing v. Di-Chem, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (attachment or replevin); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (termination of government employment); Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (termination of Social Security disability payments).
In 1970 the Court decided Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), a pivotal case on the issue of when a trial-type hearing must be granted prior to a deprivation. The regulatory procedure involved provided that benefits for families with dependent children could not be finally terminated without a full hearing. The question in Goldberg was whether the termination could precede the hearing. The Court held that it could not, because the recipient might be deprived "of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." 397 U.S. at 264, 90 S.Ct. at 1018. The case was widely interpreted by the lower courts, without the qualification implied by the quoted language, as requiring full hearings before many kinds of deprivations. See 2 Davis, Administrative Law § 11:12 (1979).
An important article by Judge Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267 (1975), helped stop the flood of such cases. He advocated that the courts apply a cost-benefit, or balancing, analysis to decide what procedural safeguards are demanded by due process for each type of deprivation: "The required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it." Id. at 1278. He identified the safeguards which may be invoked, roughly in their order of priority, as: (1) An unbiased tribunal; (2) notice of the proposed action and the grounds asserted for it; (3) an opportunity to present reasons why the proposed action should not be taken; (4-6) the right to call witnesses, to know the evidence against one, and to have decision based only on the evidence presented; (7) counsel; (8-9) the making of a record and a statement of reasons; (10) public attendance; and (11) judicial review. Id. at 1279-95. For similar listings see Goldberg v. *896 Kelly, supra; Nowak, supra, at 499; and 2 Davis, supra, at 327. These safeguards should not be considered separately, Judge Friendly admonished; if a government goes further than is constitutionally demanded with respect to one, this may justify diminishing or eliminating another. Friendly, supra, at 1279.
The Supreme Court, in effect, affirmed Judge Friendly in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), holding that an evidentiary trial-type hearing is not required prior to the termination of Social Security disability payments. See 2 Davis, supra, at 391. The Court contrasted welfare payments, which may be "the very means by which to live," with disability payments which are "not based upon financial need." 424 U.S. at 340, 96 S.Ct. at 905. Nevertheless, the Court did not hold in Eldridge that the recipient was not entitled to opportunity to be heard before disability payments could be terminated; it held that the opportunity to be heard that Eldridge had been given, which was less than a full hearing, was sufficient. Prior to a cutoff of benefits the recipient was given notice of the agency's tentative assessment, the reasons therefore, and a summary of the evidence it considered most relevant; opportunity was afforded the recipient to submit additional evidence or arguments in writing before cutoff of benefits; the medical assessment of the worker's condition based primarily on doctors' reports implicated a sharply focused and easily documented decision, lessening the potential value of an evidentiary hearing; the decision to terminate benefits was made by a state agency and reviewed by a Social Security examiner before termination; the recipient had a right to seek de novo reconsideration. The Court's balancing involved a weighing of the disadvantage to Eldridge of being limited to that procedure before the termination against the advantages to the government of avoiding the administrative burden of a full hearing before termination in all cases.[1] See 2 Davis, supra, at 391, 500.
Judge Friendly claims that the Supreme Court's decisions, except for Goldberg v. Kelly, conform to this balancing approach. Friendly, supra, at 1279. A brief review of the Court's decisions in the prejudgment seizure cases, which involve deprivations similar to the one in the present case, indicate that he is correct. In Fuentes v. Shevin, supra, consumers in Florida and Pennsylvania, who had purchased goods under revolving credit plans, attacked state statutes which authorized the summary seizure of chattels under a writ of replevin. Determining that there was no extraordinary situation which would justify the summary seizure, the court held that due process had been denied by the replevin provision insofar as it denied the right to a hearing before the chattels were taken from the possessor. Less than two years later, however, in Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the court upheld the constitutionality of Louisiana statutory sequestration provisions which provided for pre-judgment seizure of property without requiring a prior hearing. Fuentes was distinguished on several points: In prejudgment sequestrations the property is not, in reality, solely that of the defendant debtor; both creditor and debtor have substantial property interests in the sequestered property; the Louisiana statutes afforded several protections absent in Fuentes, viz., the writ could issue only when the defendant was in a position to conceal, dispose of, waste or remove the property, and then only when the nature, grounds and amount of the claim clearly appeared from specific facts stated; the showing of grounds for the writ must have been made to a judicial officer, who alone could authorize the seizure; and the debtor *897 could immediately seek dissolution of the writ unless the creditor proved the grounds on which the writ issued. In North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the court held that Georgia statutes authorizing garnishment of a debtor's bank account without prior notice or hearing violated the due process clause because they contained none of the saving characteristics of the Louisiana sequestration statute examined in Mitchell. Specifically, the Georgia garnishment writ was issuable on plaintiff's conclusory affidavit, no judicial participation was required, there was no provision for an early hearing at which the creditor must prove grounds for seizure, and the debtor's only means of dissolving the writ was to post a bond protecting the creditor. See Note, Prejudgment Seizures and the Due Process Clause: North Georgia Finishing v. Di-Chem, Inc., 29 S.W. L.J. 660 (1975).
One further decision should be included in our survey because it establishes an additional principle for procedural justice in cases where full trial-type hearings are inappropriate. In Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), several high school students were suspended for up to ten days without a hearing of any kind. For instance, one was caught in a mass arrest and suspended for ten days "without ever being told what she was accused of doing or being given an opportunity to explain her presence among those arrested." The Court held that she had an interest protected by due process, which required in that case "at least" the rudimentary precautions "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581, 95 S.Ct. at 739. However, in requiring opportunity to respond to the charges, the Court also refused to require trial procedure, explicitly denying "opportunity to secure counsel, to confront and cross-examine ... or to call his own witnesses. To impose in each case even truncated trial-type procedures might well overwhelm administrative facilities." 419 U.S. at 583, 95 S.Ct. at 740.
According to Professor Davis, Goss is a "great case" enunciating an important principle: "In some circumstances due process does not require trial procedure but forbids resolving a question of adjudicative fact against a party without first allowing him to respond informally to a summary of adverse evidence." 2 Davis, supra, at 474. Reading Goss with Eldridge, Professor Davis contends that the cardinal proposition of Goss is that on a question of adjudicative fact for which a trial is not appropriate, due process may require notice and an opportunity for informal response; that the important idea of Eldridge is that a main reason for denying a trial-type hearing may be that the informal procedure the agency has provided is adequate, Id. at 474; and that administrators can apply the Goss principle to most of the huge bulk of informal decisions, with hardly any expense or inconvenience, but with a significant gain for procedural justice. Id. at 475.
We turn first to a description of the city's procedures for immobilizing a motor vehicle, and then consider whether they are constitutionally adequate.

3.
The City of New Orleans has established a vehicular immobilization system by means of ordinances, contract and administrative procedures. An unoccupied vehicle found on a street or highway may be immobilized if three or more unpaid parking violations have been recorded against it. New Orleans Municipal Ordinances §§ 38-272, 274(b). In most cases parking tickets are written by civilian employees of the city. Each parking ticket contains a statement that a vehicle owner may contest the violation by calling a designated phone number and that "failure to pay or request a hearing within fifteen days will result in: 1) A penalty added to the fine ... 2) The possible immobilization or impoundment of your vehicle. 3) The possibility of additional penalties." If the fine listed on the ticket is not paid and a hearing is not *898 timely requested, a notice of the outstanding parking ticket, followed by a delinquent notice, is mailed to the registered owner of the vehicle, notifying him of the unpaid ticket, demanding payment, and inviting him to contact a designated city office if he has any questions or wishes to contest the ticket.[2]
The city by contract employs the services of Datacom, Inc., a private corporation, for the collection of parking tickets on a contingent fee basis. In addition to other compensation under the contract, Datacom receives 35% of collections on tickets on in-state cars paid ninety days after issuance and 40% of collections on tickets on out-of-state cars paid over thirty days after issuance. Pursuant to its contract Datacom performs several types of services, including notice processing and administration of a scofflaw immobilization program.
When an alleged parking violator fails to pay his ticket, Datacom mails the registered vehicle owner a first notice targeted for delivery thirty days after the ticket is issued and, if necessary, a second notice mailed at sixty days post ticket issuance. These notices inform the registered owner of the unpaid ticket, demand payment and invite him to contact a designated city office if he has any questions or wishes to contest the ticket. For this purpose, Datacom purchases the names and addresses of registered owners of ticketed vehicles from state motor vehicle agencies.
Datacom helps to administer the city's "scofflaw immobilization program" or booting operation. The purpose of the program is to encourage violators to obey the laws, pay fines timely, and to serve as a visible advertisement that the parking laws are being enforced. Datacom, with the assistance of its subcontractor, Gulf Systems, Inc., determines from computerized data kept on all parking tickets which vehicles have accumulated sufficient tickets to become subject to booting. The grounds for immobilization, agreed upon informally between the city and Datacom, as documented only by a letter from the company to the municipality, consist of three or more tickets meeting the following criteria:
Ticket issued after January 17, 1983
Ticket issued not more than 17 months past
Any amount paid is less than fine minus reduction and amount due greater than zero
Ticket has no court or other dispositions recorded against it except guilty, failed to appear, or guilty with various reduced fines or penalties
Ticket has no suspensions recorded against it
Ticket has no court date scheduled except one which is at least ten days in the past
Notices mailed to the owner have not come back as returned or undeliverable mail
All tickets issued against Louisiana plates must have been sent a notice at least seven days prior and all eligible tickets must have been in the same name as the most recent eligible ticket. Tickets issued against out of state registered vehicles must only be in penalty status.
City Exhibit 51.
Datacom prepares a "scofflaw book" or "hot book" listing all license plates in plate and state order which meet the criteria for booting. The "hot book" is given to city employees with instructions to search for and immobilize the listed vehicles when they are legally parked on city streets. Illegally parked cars are not booted because this would aggravate the hazard or obstruction created by the violation. Before placing a boot device on each vehicle, the boot crew calls a city dispatcher with *899 access to the latest computerized data to see if the status of the vehicle has changed or if it has been removed from the list. Datacom has the authority to suspend the notice process or to remove a license plate number from the hot book. Datacom exercises this discretion on behalf of vehicle owners who communicate with the company and furnish grounds for further investigation, or make an earnest effort to pay or arrange to pay fines.
An immobilized vehicle may be released only upon the payment of all accumulated fines plus a $30.00 boot fee, or the posting of a cash bond in the same amount. A person posting such a bond may obtain an expedited hearing within three judicial days. The city's ordinances and administrative procedure as reflected by the record do not provide how a person who fails to post bond may obtain a hearing. The question of whether there are constitutionally adequate post-seizure safeguards for those who cannot or do not post the cash bond has not been raised in the present case. See Fuentes v. Shevin, 407 U.S. at 84 n. 14, 92 S.Ct. at 1996 n. 14.

4.
The City's procedure for deciding that a person should be deprived of the use of his automobile falls short of due process requirements. The immobilization scheme does not provide for a neutral decision maker to decide whether a vehicle owner should be classed as a scofflaw and targeted for booting, notice to an owner that such action is about to be taken against him, or an opportunity to respond at least informally to a summary of adverse evidence.

A. Notice
In Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), the Court recognized that prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause, a State must provide "notice reasonably calculated, under all circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." In subsequent cases, the Court has adhered unwaveringly to the principle announced in Mullane. See, e.g., Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956); Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962); Greene v. Lindsey, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982).
Recently, in Mennonite Board of Missions v. Adams, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), the Court held that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well-versed in commercial practice, if its name and address are reasonably ascertainable." Id. at 2712. The Court reversed a judgment by state courts quieting title to a purchaser at tax sale, holding that the notice to a mortgagee by publication did not meet the requirements of due process. Furthermore, the court declared, "a mortgagee's knowledge of delinquency in the payment of taxes is not equivalent to notice that a tax sale is pending. The latter `was the information which the [County] was constitutionally obliged to give personally to the appellantan obligation which the mailing of a single letter would have discharged.'" Id. at 2712.
For the same reasons, we conclude that a notice or ticket which the city mails to a vehicle owner or affixes to his car window, containing among other information an elliptical statement that failure to pay a parking ticket may possibly lead to immobilization, does not constitute notice reasonably calculated to apprise the owner of the pendency of an action to declare him a scofflaw and have his vehicle booted. An owner's knowledge of his delinquency in payment of parking tickets is not equivalent to notice that an immobilization proceeding is pending.
The city's notification procedure, while adequate to apprise a vehicle owner that each parking ticket enlarges the possibility *900 that his car can be booted, was not "reasonably calculated" to inform him of "the pendency of an action" for immobilization and the availability of "an opportunity to present [his] objections." Mullane v. Central Hanover Trust Co., supra, 339 U.S., at 314, 20 S.Ct. at 657. The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending "hearing." See e.g., Wolff v. McDonnell, 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974); Morrissey v. Brewer, 408 U.S. 471, 486-87, 92 S.Ct. 2593, 2602-03, 33 L.Ed.2d 484 (1972); In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967); Anti-Fascist Committee v. McGrath, 341 U.S. 123, 171-72, 71 S.Ct. 624, 648-49, 95 L.Ed. 817 (Frankfurter, J., concurring). Notice in a case of this kind does not comport with constitutional requirements when it does not advise the vehicle owner of the availability of a procedure for protesting a proposed deprivation of his automobile as unjustified. See Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). As no such notice was given relator, he was deprived of the notice which was his due.

B. Safeguards Required
Under the balancing approach outlined in Mathews v. Eldridge, some administrative procedure for entertaining vehicle owner complaints prior to booting is required to afford reasonable assurance against erroneous or arbitrary deprivation of property which may be a person's sole means of transportation. The vehicle owner's interest is self-evident. A motor vehicle is a necessity of modern life; indeed, the disruption of this essential mode of transportation for even short periods of time may drastically affect one's livelihood and safety. "And the risk of an erroneous deprivation, given the necessary reliance on computers,[3] is not insubstantial."[4]Memphis Light, Gas & Water Division v. Croft, supra, 436 U.S. at 18, 98 S.Ct. at 1564. At the very minimum, therefore, a motorist facing immobilization of perhaps his only effective means of transportation and the consequent interference with protected property and liberty interests must be given some kind of notice and afforded some kind of hearing. Cf. Goss v. Lopez, 419 U.S. at 579, 95 S.Ct. at 738.
The Due Process Clause will not shield the vehicle owner from deprivations properly imposed, but it disserves both his interest and the interest of the city if his deprivation is in fact unwarranted. The risk of error or unfairness caused by human or computer fault in the immobilization process is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference. Cf. Goss v. Lopez, supra. In the operation of an efficient parking program with public approval and cooperation, a municipality may be expected to make all reasonable efforts to minimize errors, unfair treatment and the resulting popular dissatisfaction and recalcitrance. Cf. Memphis Light, Gas & Water Division v. Croft, 436 U.S. at 19, 98 S.Ct. at 1565.
Due Process requires at least rudimentary precautions against unfair or mistaken classification of persons as scofflaws and against arbitrary deprivation of the use of their vehicles, viz., that the registered owner of a vehicle be given written notice by mail of a proposed order targeting his car for booting, and that he *901 be afforded a brief period before issuance of the order within which to make an informal oral or written statement why the vehicle should not be booted. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental requirement of due process. Cleveland Board of Education v. Loudermill, ___ U.S. ___, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985); see Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1281 (1975). We stop short of construing the Due Process Clause to require that the owner be given the opportunity to confront and cross examine witnesses, or to call witnesses. To impose in each case even truncated trial-type procedures might well overwhelm administrative facilities. Cf. Goss v. Lopez, 419 U.S. at 583, 95 S.Ct. at 740.
On the other hand, requiring effective notice and informal discussion permitting the motorist to oppose the targeting of his vehicle will provide a meaningful hedge against erroneous or unfair action without being unduly burdensome. Under the city's existing procedure, the registered owner of a vehicle which incurs a parking violation charge is sent two delinquent notices within about sixty days of the ticket issuance if a fine is not paid timely. Requiring at least that there be notification of the proposed boot order in the final mailing and a brief period for informal discussion or other communication prior to issuance of the immobilization order will add little expense or delay to the fact-finding function. In fact, the city's small burden of allowing a private party a chance to respond to a statement or a summary of adverse evidence may be offset substantially by increased fine collections due to more effective notice and the clear, specific threat of vehicular immobilization.

C. Neutral Decision Maker
The essential guarantee of the Due Process Clause is fundamentally fair procedure for the individual in the resolution of the factual and legal basis for government actions which deprive him of life, liberty or property. Nowak, supra, at 501. Therefore, there must be some type of neutral and detached decision maker, be it judge, hearing officer or agency. The Supreme Court has consistently held that a "fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). This requirement applies to agencies and government hearing officers as well as judges. Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 1463, 43 L.Ed.2d 712 (1975); Gibson v. Berryhill, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). "[A]n impartial decision maker is essential" to due process. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970).
Under the city's existing procedure, Datacom, Inc. decides which automobiles shall be targeted for booting and when city employees shall be instructed to immobilize them. Although Datacom, Inc. derives no direct revenues from booting, it receives a significant financial benefit from the immobilization program. The city presented evidence that booting functions as the heart of its enforcement program and has substantially increased parking fine collections in other cities. Since Datacom receives a commission on many of the fines collected, it has a demonstrable financial interest in maintaining the booting program at a level favorable to collections. Although the record contains no evidence of wrongdoing, this financial interest disqualifies Datacom as a neutral and detached decision maker.
Due Process requires that a decision maker not have a direct or indirect financial stake which would give a possible temptation to the average person as a decision maker to make him partisan towards maintaining a high level of revenue generated by his adjudicative function. Ward v. Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Even if an individual cannot show special prejudice in his particular case, the situation in which an official occupies two inconsistent positions, one partisan and the other *902 judicial, necessarily involves a lack of due process. See Ward v. Monroeville, supra. Nor may the initial factfinding process be deemed constitutionally acceptable simply because the government eventually offers a litigant an impartial de novo adjudication; he is entitled to a "neutral and detached judge in the first instance." 409 U.S. at 62, 93 S.Ct. at 84.
The requirement of a neutral and detached decision maker should not impose a great burden on the city. Such decision makers need not be judges, magistrates or persons with special expertise. The deciding officer's function would be to determine that proposed boot orders are warranted, to consider informal oral or written responses, and to cancel immobilization orders when there is just cause. The vehicle owner's response would be considered for the limited purpose of determining whether his vehicle was properly designated for booting due to excessive unresolved parking tickets. The question of his guilt or innocence of the underlying parking violation charges themselves cannot properly be determined in an informal proceeding. Preparation of evidence that vehicles are subject to booting may continue as under the existing procedure, and such evidence could be presented to decision makers in affidavit form. Generally speaking, administrative officers need not hear witnesses testify on such matters and may imitate the practices of judges who probably generally read and consider records only to such an extent as subjectively seems necessary in order to make a conscientious decision. 3 Davis, supra, §§ 17.2, 17.3.

5.
The city contends that (1) any perceived inadequacy in its immobilization procedure is not fatal because this is an extraordinary situation which warrants dispensing with notice and a prior hearing, and (2) the boot cases from other jurisdictions support upholding its procedure.

A. Extraordinary Situations
Ordinarily, due process of law requires an opportunity for "some kind of hearing" prior to the deprivation of a significant property interest. See Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). Only in a few limited, "extraordinary" or "truly unusual" situations has the Supreme Court allowed outright seizure without opportunity for a prior hearing or other effective substitute safeguards. "First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute that it was necessary and justified in the particular instance." Fuentes v. Shevin, supra, 407 U.S. at 91, 92 S.Ct. 2000. Falling within the limited, "extraordinary" category described above are the cases relied on by the city: Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) (seizure of back taxes owed the federal government); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (government seizure of ship used to transport contraband). "Other cases involving extraordinary situations" are: Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of misbranded drugs); Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (seizure of assets of a financially troubled savings bank); North Am. Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of contaminated food shipments).
On the other hand, the routine daily booting of automobiles as part of a municipal parking enforcement system does not present a "truly unusual" situation justifying outright seizure without opportunity for notice and at least an informal hearing prior to final issuance of the order to boot. Seizure before notice of a pending proceeding to boot and an opportunity to object informally is not necessary to secure any governmental or public interest involved *903 in the booting operation. There is no need for action so prompt following the initial proposal to boot as to preclude effective notice and a chance to be heard at least informally. The New Orleans city government does not maintain a strict monopoly of its booting operation, but, in effect, permits an interested party to control and direct its use of force.

B. Other Jurisdictions' Boot and Tow Cases
The city's brief cites Sutton v. City of Milwaukee, 672 F.2d 644 (7th Cir.1982); Breath v. Cronvich, 729 F.2d 1006, 1009 (5th Cir.1984); and Remm v. Landrieu, 418 F.Supp. 542 (E.D.La.1976) in support of its position. Each of these cases dealt with the validity of towing cars that were illegally parked at the time that they were towed, a case that is not before us today. In Bricker v. Craven, 391 F.Supp. 601 (D.Mass.1975), the court was likewise faced with a question not presented to this court today: the difficulty of giving notice to the owners of vehicles registered out of state. Also, that court expressly found that the person initiating the seizure was a government official, that the state kept strict control over its monopoly of legitimate force, which is not true in the case before us.
Other cases cited by the city include Grant v. City of Chicago, 594 F.Supp. 1441 (N.D.Ill.1984); Bane v. Boston, 8 Mass. App. 552, 396 N.E.2d 155 (1979); and Gillam v. Landrieu, 455 F.Supp. 1030 (E.D. La.1978). The courts in those cases concluded, either expressly or implicitly, that affording a pre-immobilization hearing would impose a costly administrative burden. But as we discuss above, due process does not require an all-or-nothing choice between no hearing at all and a full-blown, trial-type hearing. The sort of informal procedure required by the due process clause as interpreted by the Court in Mathews v. Eldridge and Goss v. Lopez will not impose prohibitive cost on the city, and might even increase its revenues. Also, none of the cases relied upon by the city mentions the involvement of a private, financially interested actor exercising governmental discretion, such as the record in this case shows that Datacom exercises in New Orleans.

6.
Because of the failure to provide notice reasonably calculated to apprise relator of the proposed action by the city to deprive him of the use of his vehicle, and the failure to provide him with an opportunity to respond informally to a summary of the adverse evidence before the finding by a neutral and detached decision maker of the existence of sufficient unpaid parking tickets to warrant the booting of his vehicle, we hold that the city deprived relator of an interest in property without due process of law. Our holding, however, is a narrow one. We do not question the power of the city to seize a motor vehicle against which there have been excessive unresolved parking charges before a final judgment as to the validity of the charges, so long as the city has given the owner notice and a chance to contest the classification of his vehicle in a fair prior informal procedure. Due process does not require that the vehicle owner be afforded in the informal process any other trial-type safeguard such as the opportunity to confront and cross-examine witnesses or to call witnesses of his own. The owner may not litigate his guilt or innocence of the alleged parking violations in the informal procedure, but is entitled to question only whether the criteria for booting his vehicle have been met. Moreover, there are many legitimate potential variations of such an informal procedure which the city may adopt.
The judgments of the court of appeal and the district court are vacated, and the case is remanded for further proceedings consistent with this opinion.
VACATED AND REMANDED.
WATSON, J., concurs being of the opinion that seizure of a legally parked vehicle to collect parking tickets violates fundamental constitutional rights including due process and presumption of innocence.
*904 BLANCHE, J., concurs and assigns reasons.
MARCUS, J., dissents and assigns reasons.
BLANCHE, Justice (concurring).
I concur in the holding that sufficient notice was not given to Ulmer Wilson before his vehicle was immobilized. Once it is determined that the notice was insufficient, this Court need not decide whether the order to immobilize must be issued by a neutral decision maker. Since that part of the opinion is merely advisory in nature, I do not join in that portion of the opinion.
I respectfully concur.
MARCUS, Justice (dissenting).
I do not consider that the city's booting procedure violates due process guarantees. Accordingly, I respectfully dissent.
NOTES
[1] The Court formulated the factors to be balanced as: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. at 903.
[2] The actual procedure varies from that established by ordinance, which calls for the city, upon an owner's failure to respond to a second notice, to proceed by affidavit as provided by state law and city ordinances. New Orleans Municipal Ordinances § 38-271. The record does not make clear what kind of hearing an owner is afforded if he questions or contests a ticket as suggested by the delinquency notices, what must be proved, or who has the burden of proof.
[3] "In recent years Congress has been concerned by the problems of computer error. See, e.g., S.Rep. No. 93-278, p. 5 (1973) (billing errors in consumer credit transactions); Senate Committee on Government Operations, Problems Associated with Computer Technology in Federal Programs and Private Industry: Computer Abuses, 94th Cong., 2d Sess. (Comm. Print 1976)." 436 U.S. at 18 n. 20, 98 S.Ct. at 1564 n. 20 (footnote renumbered).
[4] "See, e.g., Palmer v. Columbia Gas of Ohio, Inc., 479 F.2d [153], at 158 [(6th Cir.1973)]; Davis v. Weir, 497 F.2d 139, 142 (CA5 1974); Bronson v. Consolidated Edison Co. of New York, 350 F.Supp. 443, 448 n. 11 (SDNY 1972) (16% of the complaints investigated by New York Public Service Commission resulted in adjustments in favor of the customer)." Id. at 18 n. 21, 98 S.Ct. at 1565 n. 21 (footnote renumbered).