649 So.2d 1003 (1994)
Bernadette RUBIN, Plaintiff-Appellant,
v.
LAFAYETTE PARISH SCHOOL BOARD, Defendant-Appellee.
No. 93-473.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1994.
Rehearing Denied March 1, 1995.
*1005 James Isaac Funderburk, Abbeville, for Bernadette F. Rubin.
L. Lane Roy, Lafayette, for Lafayette Parish School Bd., et al.
Before LABORDE, YELVERTON, COOKS, SAUNDERS and WOODARD, JJ.
COOKS, Judge.
This case involves the appeal of a teacher dismissed from her position for willful neglect of duty. Numerous charges were lodged against Bernadette Rubin after she was transferred and assigned to teach 7th graders Life Science at Acadian Middle School. Mrs. Rubin's prior eighteen-year employment history was without blemish.[1] Mr. John Lee, Assistant Principal at Acadian Middle School, testified from his examination of school records and conversations with Mrs. Rubin's superior at J.W. Faulk Elementary School there was nothing which remotely suggested she was unskilled or morally unfit to teach the assigned course. Her record, as a whole, demonstrated she was a "good teacher" who had not displayed any prior problems with following school policies or other guidelines. Mr. Mouton, the Principal at Acadian Middle School, also examined Mrs. Rubin's personnel records and accepted the Assistant Principal's recommendation favoring her appointment. He too confirmed nothing in her long employment history warned against her continued service as an elementary teacher. Her family background militated against such negative assessment as well.
Though qualified to teach all subjects in elementary education, Bernadette Rubin's experience as a teacher was limited to instructing third graders.[2] She arrived at Acadian Middle School without any experience teaching 7th graders or instructional familiarity teaching Life Science.
Paul Long, math and science supervisor for the Parish's school system, was assigned to review Rubin's progress and to offer his advice in improving her instructional skills. His duties entailed "in-service training" of Rubin. Long also chaired the Sex Education Committee, formed to assist the Lafayette Parish School Board in developing policies and regulations for future sex education instructions if approved by a majority of its members.[3]
Noting Rubin initially experienced adjustment difficulties teaching 7th grade classes, Long explained "there is a world of difference" in teaching students who are eight (8) years of age as opposed to thirteen (13) "not only in content but [facing] what's happening *1006 to the student[s], emotionally, socially." In his words, "the genes are flying" and a teacher may experience unanticipated problems not only in delivering sensitive information to the students but in managing their classroom conduct. He also stated:
"The main thing is a complete change going from middle school to an elementary school or vice versa. The whole philosophy of the school might be a little different. There's more responsibility put on student's behavior, there's individual contact that must be made with each student, and new teachers don't always understand the procedure that must be followed for them to get the help that they need on disciplining different students."

COURSE MATERIAL AND PREPARATION
The text approved for use in Rubin's class included a section which specifically dealt with the reproduction of animals. Other chapters in the book covered the development of the human body including human heredity, the development of the human child, and the systems of the human body with detailed references to the human female's menstrual cycle. The vocabulary terms used in Chapter 6 included such words as: asexual reproduction, colostrum, egg, embryo, estrus, fertilization, fetus, gestation, ovary, placenta, regeneration, sexual reproduction, sperm, testes, umbilical cord, uterus, vagina, zygote, and mating. In the section relating to the estrus cycle of cows, the text focuses on the process humans normally understand as ovulation which entails the release of an egg from an ovary followed by the discharge of blood through the vaginal canal. In the section discussing the life cycle of frogs, the text explains "the female frog [deposits] her eggs outside of her body and the male frog [swims] over [them] and [excretes] the sperm that fertilizes the eggs." Another section contains photographs depicting a ewe with her baby sheep suckling (breast feeding) with references to the mammillary glands. Other references to the mating practices of mammals are even more sexually explicit. The text also contains specific references to human sex organs, including the vagina and penis. On a counter in the rear of the classroom were various charts depicting portions of the human body including the entire excretory system of the male and female with specific references to their sexual parts.
It is undisputed Rubin expressed, at the outset, reluctancy and concern to her supervisors about teaching the information contained in the approved text. She was aware and cautioned by other educators that Life Science is a difficult area of study to teach adolescents themselves undergoing sexual changes, i.e., "puberty." Oftentimes, as explained in the record, these students are naturally inquisitive when terms more familiarly related to human sexuality are defined and added to their still maturing vocabulary.
Rubin requested a curriculum guide to aid her in determining what information from the text she was expected to relate to the students. Initially, she was unable to locate a course guide. She then sought instructional guidance from the Principal and Mrs. Borel, the previous life science instructor. On one occasion, she specifically recalled approaching the Principal and Mrs. Borel to inquire whether it was mandatory that she teach Chapter 6 in the text. As mentioned, this Chapter contained sexually explicit terms which, Rubin explained, were sure to arouse the students' curiosity. The Principal and Mrs. Borel advised Rubin the approved course curriculum required coverage of the sensitive matters contained in Chapter 6.

RUBIN'S CLASSROOM PERFORMANCE: SUPERVISOR'S OBSERVATIONS
On the day Paul Long visited Rubin's class, he stated she was progressing well and it appeared she was not having any discipline problems. In fact, he recalled complimenting her on "bringing students back on task that day." When questioned regarding the selection and use of the approved text book, Long stated the book was selected seven (7) years prior; and he admitted it contained several sections which specifically related to human anatomy and sexual happenings. Even though teachers were instructed by him not to answer "sex education questions," *1007 he recognized it was very difficult to teach Life Science to 7th graders "full of natural curiosity." Specifically, he stated:
"Q. Isn't it reasonable to believe that students, especially children who are going through puberty, would relate what they are learning in animal reproduction to human development and human reproductive processes?
A. I'm sure they would.
Q. And isn't it correct that the teachers who are called upon to teach this material are more or less thrown out there in the fray to fend for themselves when kids come up with these types of questions?
A. It's very hard on the teachers at this time
Q. Thank you.
A. to teach.
Q. And they just try to do the best that they can with whatever it is they have to work with?
A. That's correct."

RUBIN'S VERSION OF CLASSROOM EVENTS
Rubin admitted, for the first two months of the school year, she imposed mass punishment as a disciplinary measure. As we appreciate, mass punishment is simply holding the entire class or a group of students responsible for the misbehavior of a few or one student. According to the record evidence, mass punishment was generally employed by other teachers in the system as a disciplinary measure without Board objection. All agree, Rubin imposed mass punishment at J.W. Faulk, without complaint or contrary instructions from her superiors. Shortly after her arrival at Acadian Middle School, however, several students complained about Rubin's use of mass punishment to the principal. She was instructed by him to punish only those students who were guilty of violating school rules or who were otherwise disruptive in class. Rubin testified she immediately discontinued this practice. Instead, as she stated, students were punished only if individually guilty of violating school rules. Although she admitted such punishment was still imposed by her on groups of students thereafter, she insisted each student in the group was individually responsible for the discovered infraction.
As the course progressed, the students acknowledged they questioned Rubin concerning the terms discussed in class. Rubin recalled, for example, a student asked "how a sperm gets up into the cow." In response, she stated the sperm "got into the female cow through the vaginal canal." When a student inquired whether the estrus cycle of the cows was the same as the menstrual cycle in females, Rubin stated she instructed the student to read the section dealing with the estrus cycle. The student proceeded by reading aloud in class. Rubin stated she attempted to avoid answering the student's question by expressing uncertainty regarding the similarities between the estrus cycle and the menstrual cycle. She also recalled one of the students questioned what mating meant; and, she replied it was the same as cohabitation and occurred when the male and female animal had sex. Though her attempts to explain the terminology used in the text were often awkward and difficult, she maintained on many occasions she simply instructed the students to refer to the text's glossary.
According to Rubin, one student blurted a question one day inquiring "why condoms are made of rubber boots or tires." Attempting to "brush the student off," she responded by stating the question was stupid. Mentioning one student in her class was pregnant, Rubin recalled a student asked her "out the blue" whether she believed in abortion. Answering "no," she then asked the student "what [was] the importance of the question."
On several occasions outside the classroom students asked her sensitive questions; but, she insisted in similar fashion her responses were brief and intended to avoid in depth discussion of human sexuality. When a student approached Rubin in the hallway one day complaining other students were accusing her of being sexually active because they noticed passion marks on her neck and "other stuff," Rubin stated she told the student "if she wasn't sexually active then don't worry about the other student's comments and if she was active she should be careful and do it *1008 safely." Admitting other students may have overheard this hallway discussion, she stated her intention was not to disseminate information regarding sex education generally to students. Her response, Rubin stated, was "right off the cuff" and made without serious reflection.
The students also prepared reports on diseases discussed in the text for extra points, though they were not required to do so. One of the diseases listed was gonorrhea. Rubin stated she clearly explained to the students their selection of diseases was not limited to those listed in the text; they were free to select diseases from other sources. One student, however, prepared a report on gonorrhea using the text and a medical encyclopedia.

LODGING OF COMPLAINTS AND RUBIN'S DISMISSAL
On January 22, 1990 Acadian's Assistant Principal received a telephone call from Mr. Zerangue, a central office administrative employee, who stated several parents were alleging Rubin was teaching sex education in the classroom. Lee, in response, randomly selected parents of several students in Rubin's classes to inquire whether their children made any statements regarding the teaching of sex education in the classroom. The results of Lee's survey were kept in a daily planner maintained by him with the names of the parents contacted. The majority of the parents contacted stated their children heard "someone was doing this" but they did not possess independent or personal knowledge of such occurrences in the classroom. According to Lee, none of the parents (first contacted) advised him their children had complained about Rubin teaching sex education in the class. The result of this random sample was disclosed to Zerangue the same or next day.
Two days following the call from central office, according to Rubin, Lee handed her a note written on yellow sticker paper. It stated "give Angela Schmidt's mother a call if she could help improve her grades."[4] The mother's name, Lanay Schmidt, was listed with her telephone number. Rubin testified she contacted Lanay Schmidt on the same afternoon. She recalled Schmidt was enraged and proceeded to attack her professional abilities for giving low marks to her daughter. Schmidt also accused her of teaching sex education and threatened to seek her termination if she did not change the student's grade. According to Rubin, she immediately contacted Lee and informed him of Schmidt's complaints and threats. A copy of Rubin's telephone bill was introduced which reflects a long distance telephone call was placed to Lee's residence on the evening of January 24, 1990 from Rubin's residence.[5]
Lee testified, the next day, a number of students approached him and complained Rubin punished the class for talking in the lunch line and they were required to write lines. For the first time, he stated in addition to advising Rubin the students were complaining about her use of mass punishment, he also told her several parents contacted the Board to voice their concerns about what she was teaching in the classroom. He informed her a January 26, 1990 meeting was scheduled to hear the parents' complaints.
In attendance at this meeting was Zerangue, from central office, Acadian's Principal and Assistant Principal, and several complaining parents. As Lee related, the matter attracted media attention because he noticed several TV cameramen outside the library area where the meeting was conducted. In any event, school officials collected 15-18 statements from these parents alleging Rubin made inappropriate comments in the classroom. One of the most vocal parent in attendance at this meeting was Lanay Schmidt. Rubin was removed from the *1009 classroom and assigned to assist in the resource lab. On January 31, 1990 she was officially suspended from her employment.
Zerangue testified following the January 26th meeting, the Superintendent instructed that he poll the students a second time from a cross section of Rubin's classes to inquire about her teaching sex education. In response, he contacted 50-60 students and obtained statements from them regarding the alleged incidents. Based on all the information gathered, the Superintendent addressed a memo on February 28, 1990 to the Board charging Rubin with teaching sex education in the classroom and specifically citing eighteen (18) incidents involving Rubin's alleged use of inappropriate language and references to human sexuality. The Superintendent also charged, on October 5, 1989, Rubin used mass punishment for infractions of a few students. A copy of this memo was eventually reviewed by Rubin who then filed with the Board several motions for its consideration, including:
"1. Objections to the February 28, 1990 memo, use of hearsay evidence and to improper voting procedures.
2. Motion for Discovery (notice of depositions of all potential witnesses including those indicated by Dr. Skidmore);
3. Motion to Compel Disclosure of Favorable Evidence;
4. Objection to dual representation of THE BOARD by L. Lane Roy;
5. Two (2) sets of interrogatories requesting information, much of which was public records;
6. Motion to Produce requested material, much of which was public records;
7. Objection to THE BOARD's failure to comply with the Accountability Law."
In due course, the Board refused or rejected all the motions filed by Rubin. She next petitioned the District Court for a preliminary and then permanent injunction to prevent the Board from taking any action to terminate her employment. A temporary restraining order was issued on May 14, 1990. The trial judge later dissolved the injunction specifically noting the issues raised in Rubin's petition were more appropriate subjects to raise on appeal after the hearing. Immediately thereafter, the Board forwarded to Rubin a notice fixing the tenure hearing for May 20, 1990. Rubin received the notice only four (4) days prior to the actual hearing.
Following the hearing the Board dismissed, as unsupported by sufficient evidence or untrue, fourteen of the eighteen charges lodged against Rubin. On the remaining four counts, however, a majority of the Board members found her guilty and voted to terminate her employment.

RUBIN'S CONTENTIONS ON APPEAL
On appeal, Rubin assigns the following errors for review:
"I. The Lafayette Parish School Board (hereinafter referred to as "The Board") and the district court erred by misapplying LSA-R.S. 17:443 and thereby depriving Mrs. Rubin of the due process guarantees afforded to tenured teachers by both statute and constitution.
II. The district court erred in affirming the ruling of the Board.
III. The district court erred in finding that the Board had a rational basis for terminating Mrs. Rubin based upon the substantial evidence of this case.
IV. The district court erred in failing to find that the Board acted arbitrarily and abused its discretion in its decision to terminate Mrs. Rubin.
V. Neither the Board nor the district court conducted this matter within the scope and spirit of LSA-R.S. 17:433. (Liberal construction in favor of a tenured teacher.)
VI. It was clearly erroneous to find that termination of a tenured teacher was warranted when the teacher had worked for the same system for nearly 20 years without incident, when other disciplinary action was available but not considered."

CONSTITUTIONAL PRECEPTS
Both the federal and state constitutions protect a tenured teacher's right to continued employment by requiring that certain procedural steps are followed before the *1010 teacher is terminated. The teacher's right, we have said, is a vested property right statutorily created in LSA-R.S. 17:443 which states:
"A. A permanent teacher shall not be removed from office except upon written and signed charges of willful neglect of duty, or incompetency or dishonesty ... and then only if found guilty after a hearing by the school board of the parish or city, as the case may be, which hearing may be private or public, at the option of the teacher. At least twenty days in advance of the date of the hearing, the superintendent with approval of the school board shall furnish the teacher with a copy of the written charges. Such statement of charges shall include a complete and detailed list of the specific reasons for such charges and shall include but not be limited to the following: date and place of alleged offense or offenses, names of individuals involved in or witnessing such offense or offenses, names of witnesses called or to be called to testify against the teacher at said hearing, and whether or not any such charges previously have been brought against the teacher. The teacher shall have the right to appear before the board with witnesses in his behalf and with counsel of his selection, all of whom shall be heard by the board at said hearing. For the purpose of conducting hearings hereunder the board shall have the power to issue subpoenas to compel the attendance of all witnesses on behalf of the teacher. Nothing herein contained shall impair the right to appeal to a court of competent jurisdiction.
B. If a permanent teacher is found guilty by a school board, after due and legal hearing as provided herein, on charges of willful neglect of duty, or of incompetency, or dishonesty ... the superintendent with approval of the board shall furnish to the teacher a written statement of recommendation of removal or discipline, which shall include but not be limited to the exact reasons(s) offenses(s) or instance(s) upon which the recommendation is based. Such teacher may, not more than one year from the date of said finding, petition a court of competent jurisdiction for a full hearing to review the action of the school board, and the court shall have jurisdiction to affirm or reverse the action of the school board in the matter. If the finding of the school board is reversed by the court and the teacher is ordered reinstated and restored to duty, the teacher shall be entitled to full pay for any loss of time or salary he or she may have sustained by reason of the action of the said school board."
Once property interests are created, they may not be deprived without adequate legal process. Bishop v. Wood, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Franceski v. Plaquemines Parish School Board, 772 F.2d 197 (5th Cir. 1985). As noted by the United States Supreme Court in Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) "the right to due process is conferred not by legislative grace, but by constitutional guarantee." Although a state may establish certain statutory procedural safeguards to protect property rights, still the safeguards may be judged insufficient (depending on the facts and circumstances of a particular case) to guard the particular property interest at risk. Loudermill, supra.
The Louisiana Supreme Court in Wilson v. City of New Orleans, 479 So.2d 891, 894 (La.1985) also expressed:
"[The] central meaning of procedural due process is well settled. Persons whose rights may be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified."
An equal concomitant to this right, thus, is "the right to notice and opportunity to be heard" which must be extended at a meaningful time and in a meaningful manner. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). Just how much process Rubin should have been afforded before divestiture of her tenure right is the question we must address ultimately. As stated in Wilson "due process *1011 is not a technical concept with a fixed content unrelated to the time, place and circumstances." Rather, it requires the implementation of flexible rules which may yield to the demands of the particular situation. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Louisiana Supreme Court in Wilson very aptly articulated:
"The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions. The purpose of this requirement is to protect a person's use and possession of property from arbitrary encroachmentto minimize substantially unfair or mistaken deprivations of property. Fairness can rarely be obtained by a secret, one-sided determination of facts decisive of rights, and no better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Wilson, 479 So.2d at 894 (citations omitted and emphasis added).

BOARD'S CONTENTIONS
The Board seeks to convince us that the process provided in LSA-R.S. 17:443 and 17:444 for removal of tenured teachers was followed in Rubin's case. This process, the Board urges with some insistence, adequately protects teachers' due process rights. As a safety net to the process, the Board further argues, the teacher who has been terminated may seek judicial review of the determination and present additional evidence to rebut the validity of the termination.
Judicial review, however, may prove a "hollow remedy" to a teacher wrongfully terminated. This is so partly because the standard of review in tenure cases prevents appellate courts from conducting a de novo examination of the record evidence. Ford v. Caldwell Parish School Board, 541 So.2d 955 (La.App. 2d Cir.1989); Lewis v. East Feliciana Parish School Board, 372 So.2d 649 (La.App. 1st Cir.), writ denied, 375 So.2d 959 (La.1979). This State's jurisprudence is saturated with cases routinely reaffirming that the standard for appellate review in tenure cases is limited to assessing whether a board had a "rational basis for the determination supported by substantial evidence." West v. Tangipahoa Parish School Board, 615 So.2d 979 (La.App. 1st Cir.), writ denied, 618 So.2d 414 (La.1993); Howell v. Winn Parish School Board, 332 So.2d 822 (La.1976).
The Board suggests further the procedures set forth in LSA-R.S. 17:443 and 17:444 for the removal of tenured teachers comply with the directives given in Loudermill, supra. It strongly urges Loudermill stamped with approval the process it followed in Rubin's case.
In Loudermill the United States Supreme Court described certain "root requirements" of due process which must be adhered to before terminating a teacher's employment. Before deprivation of any significant property interest, the Supreme Court stated due process requires that the individual affected must be afforded notice, a hearing, and opportunity "to present [his or her] side of the case." When factual disputes are involved, an employee's "fair opportunity to defend" may also require that she is given adequate time and notice to produce contrary testimony and to confront the accuser in front of the decision maker. As noted in Loudermill, "such an opportunity might not necessitate `elaborate' procedures ... but the fact remains that in some cases only such an opportunity to challenge the source or produce contrary evidence will suffice to support a finding that there are `reasonable grounds' to believe [the] accusations are `true'." Furthermore, the advance notice requirement (fundamental to assuring due process) envisions affording and protecting an employee's right to adequately prepare a defense to the charges and to subpoena witnesses expected to offer testimony favoring the employee's version of the facts. Fuentes, supra; Paillot v. Wooton, 559 So.2d 758 (La.1990); Parker v. French Market Corp., 615 So.2d 1347 (La. App. 4th Cir.), writ not considered, 617 So.2d 920 (La.1993). Neither the federal nor this State's adversarial scheme favor trial by ambush whether in a judicial or administrative forum.
*1012 Oftentimes dismissal for cause will involve factual dispute, but the Court cautioned "even where the facts are clear, the appropriateness of the necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before termination takes place." Loudermill, supra. See also, Goss v. Lopez, 419 U.S. 565, 583-584, 95 S.Ct. 729, 740-741, 42 L.Ed.2d 725 (1975); Gagnon v. Scarpelli, 411 U.S. 778, 784-786, 93 S.Ct. 1756, 1760-1761, 36 L.Ed.2d 656 (1973). Fairly read, Loudermill does not prescribe the precise steps which must be followed in every case where an employee disputes the facts proffered to support a discharge. Loudermill, supra.
In Wilson, supra, decided nine months after the Loudermill decision, the Louisiana Supreme Court reaffirmed "due process" is not a concept absolute in meaning and unyielding to the demands of a particular situation. The Court referenced an article written by Judge Friendly, Some Kind of Hearing, 123 U.P.A.L.Rev. 167 (1975) noting he suggested the following safeguards, in priority order as the case dictates, to assure due process: (1) an unbiased tribunal; (2) notice of the proposed action and the grounds asserted for it; (3) an opportunity to present reasons why the proposed action should not be taken; (4-6) the right to call witnesses, to know the evidence against one, and to have the decision based only on the evidence presented; (7) counsel; (8-9) the making of a record and statement of the reasons; (10) public attendance; and (11) judicial review. See also Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

DISCUSSION
Although the Board insists it complied with the process established in LSA-R.S. 17:443, et seq. and these provisions exclusively dictate what process was due Rubin, we disagree.

A.

VIOLATIONS OF STATE STATUTORY LAW
First, the actual process used by the Board before Rubin's removal was not "all" that she was statutorily due. The evidence shows the Board did not fully comply with state law mandating "the process" it must follow before voting to terminate a tenured teacher.
In relevant part, LSA-R.S. 17:443 reads:
"Such statement of charges shall include a complete and detailed list of the specific reasons for such charges and shall include but not be limited to the following: date and place of alleged offense or offenses, names of individuals involved in or witnessing such offense or offenses, names of witnesses called or to be called to testify against the teacher at said hearing, and whether or not such charges previously have been brought against the teacher...."
The teacher's right to a complete and detailed list of the specific reason for each charge against her and the Board's obligation to vote on specific charges are fundamental requisites of the Tenure Act. State ex rel. Franceski v. Plaquemines Parish School Board, 416 So.2d 150 (La.App. 4th Cir.1982), writ denied, 421 So.2d 907 (La. 1982); Lewing v. DeSoto Parish School Board, 238 La. 43, 113 So.2d 462 (La.1959); Johns v. Jefferson Davis Parish School Board, 154 So.2d 581 (La.App. 3d Cir.1963); Singleton v. Iberville Parish School Board, 136 So.2d 809 (La.App. 1st Cir.1962). Findings of guilt which do not correspond with specific charges are insufficient to legally support a decision to terminate the teacher's employment. Meaningful judicial review requires that courts know exactly which allegations or combination thereof were judged by the board as substantial evidence supporting the termination.
The ballot used by the Board members to record their votes in Rubin's case contained four charging sections. The second section contained language allegedly used by Rubin which the Superintendent cited as constituting "teaching human sexuality in violation of LSA-R.S. 17:275." We will not repeat all of the allegations contained in section 2 of the ballot listed A through M. Our reticence in so doing is partly out of concern for the teacher's reputation, particularly considering the Board rejected the majority of these *1013 allegations as either unsubstantiated or incredible. The third and fourth sections charged that Rubin, on October 5, 1989, used mass punishment for misconduct by a few students and on unspecified dates she threatened reprisal against certain students. The first section, however, unlike sections two through four, genetically recited:
"While teaching a prescribed unit of focus on life science, Chapter 6, entitled `Animal Reproduction,' Mrs. Rubin, in violation of [sic] school board policy and state law, as is prescribed in LSA-R.S. 17:275, instructed her students on human sexuality."
This section does not refer to specific acts nor state the number of times the teacher allegedly instructed the students on human sexuality, and it does not state the dates on which such infractions occurred.[6]
When the votes were finally cast, a majority of the Board members found Rubin not guilty on fourteen of the charges asserted by the Superintendent. They did return a verdict of guilty on the charges reflected in the voting ballot levelled in section 1, section 2 subparts C and M, and that portion of section 3 alleging she used mass punishment.
Rubin complains the statements made in the charges are "nothing more than conclusions which lack the factual basis necessary to comply with the requirement of a complete and detailed list of the specific reasons [for] such charges." She also asserts the allegations contained in subparagraphs A through M, except I, "fail to disclose what she is alleged to have said about each of the stated items" where and when.
In State ex rel. Franceski v. Plaquemines Parish, supra a tenured school employee challenged as vague the following charges:
"5) Said supervisor has failed to sign and submit Student referrals to the Competent Authority Team for significant periods of time resulting in a backlog, delay, and confusion in the evaluation process.
6) Said Supervisor has failed to attend numerous meetings of importance conducted by the Louisiana Department of Education, has arrived late on numerous occasions at such meetings she did attend, and has at times departed such meetings she attended before adjournment.
7) Said Supervisor did direct teacher aids to administer standardized tests to kindergarten and first grade students instead of such testing being administered by the regular kindergarten and first grade teachers."
These charges were filed against Franceski before the amendment to LSA-R.S. 17:443 which now requires that the charges shall include a complete and detailed list of specific reasons and shall include the date, place, and names of individuals involved in or witnessing such offense or offenses. The court in passing noted "had this version of the Act been in effect at the time of the tenure hearing under consideration there would be no question but that the Board failed to comply with these specificity requirements." At the time Fransceki was charged the provision only stated "[a]t least fifteen days in advance of the date of the hearing, the school board shall furnish the teacher with a copy of the written charges..." Nevertheless, the court concluded the amendment to the Tenure Act was merely "a codification of the jurisprudence which had uniformly held that a tenured teacher is entitled to have specific charges brought against her." Finding the charges were too vague, the Court stated Franceski could not prepare an adequate defense against them. Thus, to whatever extent the Board based its ultimate decision on the charges, the court declared, it was unfounded.
The amendment to the Act and the jurisprudence on which it was predicated compels a finding in Rubin's case that the charge contained in Section 1 of the ballot does not comply with the "specification requirements" imposed in tenure cases. Our jurisprudence has long established that the Teacher Tenure Act should be liberally construed in favor of the teacher it is designed to protect. Thus, *1014 school boards must strictly comply with the removal provisions of the Act to legally discharge a tenured teacher. Lewing, supra; Lea v. Orleans Parish School Board, 228 La. 987, 84 So.2d 610 (La.1955); Andrews v. Union Parish School Board, 191 La. 90, 184 So. 552 (La.1938); Fleming v. Concordia Parish School Board, 275 So.2d 795 (La.App. 3rd Cir.), writ denied, 279 So.2d 204 (La.1973); State v. Rapides Parish School Board, 1 So.2d 334 (La.App. 2d Cir.1941); Kennington v. Red River Parish School Board, 200 So. 514 (La.App. 2 Cir.1940).
Unlike Section 2, which contains an itemized listing of language allegedly used by Rubin in instructing the students on human sexuality, Section 1 is couched in "catch-all" language. This section grievously failed to meet the specification requirements mandated in LSA-R.S. 17:443. Rubin could not adequately prepare or present a defense to this vague charge. Furthermore, the charge is so all encompassing and duplicitous in nature, we are unable to properly assess on appeal whether any evidence was presented to support it. As mentioned, the Board rejected fourteen (14) of the charges lodged against Rubin. We are not inclined nor required to ferret through the record in search of other evidence which the Board might have relied upon, if any, in returning a guilty finding on this general charge. The charge is legally deficient and the Board's ultimate reliance on it in discharging Rubin violated the Teacher Tenure Act.
Subparts C and M of Section 2 charged that Rubin used inappropriate language by commenting on the composition of and use of condoms and the human menstrual cycle. Except for the statement that Rubin instructed students on human sexuality "while teaching the prescribed unit of focus on life science," no dates or other time references when the infractions allegedly occurred were mentioned. Although the Superintendent listed the names of several students as potential witnesses, he did not indicate which student, if any, witnessed each of the charges levelled against Rubin.
LSA-R.S. 17:443 also provides that the statement of charges shall include the "date and place of the alleged offense or offenses," and the "names of individuals involved in or witnessing such offense or offenses." Rubin complains without this information she was unable to defend against the allegations contained in Section 2 of the ballot. We note the Board denied Rubin's pre-hearing motion to depose the potential witnesses listed by the Superintendent.
The Board's failure to specify the dates Rubin allegedly used the language stated in Subparts C and M and its failure to further identify which potential witness or witnesses heard each allegation clearly violated the notice provision of the Tenure Act. We cannot say after examining the record as a whole that the Board's failure to provide the required information to Rubin did not prejudice her defense. The record suggests the contrary.
Rubin steadfastly maintained at the hearing she did not teach sex education by instructing students on the use of condoms nor did she provide them with specific information on the human menstrual cycle. The students' version of the occurrences varied; and, at times, are riddled with contradictions. Many students did not hear any discussions whatsoever on the female menstrual cycle or the composition and use of condoms; others were unable to recall whether the alleged comments were in response to questions by students or whether the comments were actually made by the students rather than the teacher. On cross-examination, several students admitted their recollection of what was said in the classroom was not based on independent knowledge but on what they were told by other students. The students who insisted that Rubin told them her daughter's "period had started" and "how many days after [the] menstrual cycle you can get pregnant," could not relate with the same ease of recollection when these comments occurred. The students who stated Rubin discussed "what condoms were made of and they should be used to practice safe sex" also suffered memory loss when questioned regarding the dates such statements were allegedly made by her. None of Rubin's colleagues at Acadian Middle School were called to corroborate the students' testimony either by confirming they overheard such alleged *1015 comments by Rubin in the classroom; or, more importantly, that the students related to them such discussions took place in the classroom.
While the Board's attorney argues in brief all 45 or 46 students confirmed all the factual allegations made against Rubin, we disagree. Even the Board found 14 of the allegations were not supported by the students' testimony. We must conclude the Board's failure to follow the notice requirements of LSA-R.S. 17:443 also rendered its subsequent finding of guilt based on Subparts C and M unfounded.
Even the charge in Section 3 citing Rubin with using mass punishment on October 5, 1989 by incorporating "and at other times" falls short of the specification mandate. The teacher admitted at the beginning of the school year she used mass punishment as a means of disciplining students, a method practiced by her at J.W. Faulk. Several students confirmed it was not uncommon for other teachers at Acadian Middle School to use mass punishment. Rubin insisted, however, she complied immediately with the later instructions given by her superiors to discontinue imposing mass punishment. As to the specific October 9, 1989 charge, many students did not recall the incident or could not remember if she punished the whole class or just a group of students. Rubin acknowledged, though she discontinued imposing mass punishment, she continued to punish several students or a group of students all of whom she considered individually guilty of violating school policies.
The October 9, 1989 infraction, standing alone, is not so egregious as to warrant termination of the teacher or to constitute willful neglect of duty. West, supra; Landry v. Ascension Parish School Board, 415 So.2d 473 (La.App. 1st Cir.), writ denied, 420 So.2d 448 (La.1982). The record fails to disclose any rule or regulation adopted by the Board prohibiting the use of mass punishment by teachers. As mentioned, this practice was employed by other teachers in the system at various schools throughout the district. Even at Acadian Middle School, no written policy appears in the record banning the use of such punishment method. As noted, the students testified other teachers at the school used mass punishment in the past. Rubin was not charged with insubordination or otherwise failing to heed orders issued by her superiors.
"Willful neglect" is defined by Black's Law Dictionary, Sixth Edition, as the "intentional disregard of a plain or manifest duty, in the performance of which the public ... has an interest." The duty not to impose mass punishment, to the extent it existed at all, originated in this case from the preference of Rubin's superiors at Acadian Middle School. This duty was not imposed on all teachers in the system or at Acadian Middle School; and mass punishment as a disciplinary measure was not outlawed by any rules or regulations reflecting a public's interest in prohibiting its use. We believe, therefore, a teacher's action in imposing mass punishment as a disciplinary action does not constitute willful neglect of duty per se.
Moreover, the record in this case does not contain any evidence suggesting Rubin was instructed not to punish more than one student at a time though several were guilty of the same infraction. When fairly reviewed as a whole, the record simply does not establish that Rubin punished students who were not individually guilty of misbehaving on October 9, 1989. The uncertain testimony of the students was not "substantial" enough to factually support a finding of guilt on the mass punishment charge; and legally Rubin's admitted conduct did not constitute willful neglect of duty. The Principal and Assistant Principal stated even if Rubin used mass punishment, this infraction alone would not have caused them to seek her termination. Rubin's eighteen-year employment history evidenced that she was a good teacher who complied with school policies and instructions issued by her superiors. The Board's vote to terminate her employment based on this single remaining charge would render it "arbitrary and capricious" in violation of the Teacher Tenure Act.
Rubin complains further that the ballot additionally violated LSA-R.S. 17:443(B) which allows the Board to use other disciplinary means as punishment without terminating a teacher's employment. Marguerite *1016 Lyle, a board member deposed after the tenure hearing, stated she believed the Board's mission was to decide whether to terminate Rubin and "no other punishment options" were available. By limiting the Board to deciding whether or not to terminate Rubin, the ballot in effect removed the Board's authority to exact a lesser punishment. The ballot was drafted and presented by the Board's attorney who despite objection voiced by Rubin declined to modify it. The Board's authority to impose a disciplinary measure short of termination in a Tenure case is non-delegable. For this reason, as well, we find the Ballot violated the Teacher Tenure Act.

B.

CONSTITUTIONAL VIOLATIONS
Second, the actual process used by the Board before Rubin's removal was not "all" that she was constitutionally due.
The statutory requirement that the statement of charges contain certain information is also designed to insure that the teacher is afforded "due process." This right, though protected in LSA-R.S. 17:443, is constitutionally guaranteed. U.S. Const. Amend. XIV; La. Const. Art. 1, Sec. 2. Due process necessarily requires that a teacher is fully apprised of the charges against her and that she is given a fair opportunity to defend. Charges which do not articulate specific facts to support them and provide the dates of the alleged occurrences violate the fundamental requirements of constitutional due process. A teacher is entitled to know exactly what alleged facts form the basis of the proceedings against her so that she is able to prepare an adequate defense. The vague and unspecified charges which the Board judged Rubin guilty violated her due process right to notice. As mentioned, we cannot say this violation was not prejudicial to her defense. Although Rubin filed motions prior to the hearing seeking to depose potential witnesses listed by the board, her request was denied.
Further, 33 statements authored by students and their parents were disseminated to each Board member in a packet prior to the hearing. These statements contained allegations against Rubin which were not mentioned in the charges filed against her nor disclosed in the Superintendent's February memo. Although the Board was not called to vote on these extraneous allegations, we cannot say they did not affect the Board's decision to terminate Rubin. The submission of the unscreened statements to the Board further infringed on Rubin's due process right to know the allegations against her and to defend against only those allegations actually charged.

DECREE
We pretermit addressing the remaining issues raised by Rubin alleging other constitutional and statutory violations. Considering the violations thus discussed, we cannot affirm the Board's determination. Its failure to comply with the expressed requirements of LSA-R.S. 17:443 and those recognized by constitutional due process principles render the decision to terminate Rubin unenforceable.
Accordingly, the Lafayette Parish School Board is hereby ordered to reinstate Bernadette Rubin to the position of a teacher with tenure at her former employment level; and reimburse her for all pay since the day of discharge, together with all other emoluments she would have been entitled but for the improper discharge. All costs below and on appeal, for which the Board is legally liable, are assessed against it.
REVERSED AND RENDERED.
LABORDE, J., concurs in results and assigns reasons.
YELVERTON and WOODARD, JJ., dissent and assign reasons.
LABORDE, Judge, concurs in the result.
I agree with the majority in the outcome in this case, however I feel that I must clarify my opinion.
In the present case, the ballot presented to the School Board for voting on the charges against Rubin was not reasonably precise. The three page ballot included the following: one page of charges to be voted on by the Board, one page directing the Board to vote *1017 on whether Rubin was guilty of incompetency or willful neglect of duty, and the last page which required the Board to vote on whether Rubin's employment should be terminated. In my view, the School Board was not adequately informed of the alternatives to termination when voting on these charges. They were only presented one option, which was to terminate Rubin's employment. R.S. 17:443(B) grants the Board the authority to exact other disciplinary measures other than termination to punish teacher misconduct. The Board erred in failing to present a ballot to its members which included alternative disciplinary measures to termination.
I respectfully concur.
YELVERTON, Judge, dissenting.
Ninety-Seven witnesses testified at the tenure hearing. There were 45 students from Ms. Rubin's Life Science classes, 12 School Board employees, 27 parents, and 13 character witnesses. The hearing lasted four days. It was transcribed and is in nine volumes of a record that consists of over 2,200 pages. A reading of this record reveals that the great bulk of it does not favor Ms. Rubin's side of the case.
Ms. Rubin was accorded due process at every step. The requirements of the Teacher Tenure Law as developed in the settled jurisprudence were complied with exactly. An objective analysis of the proceedings shows this.
In late January and early February of 1990 school officials conducted an investigation regarding reports of Ms. Rubin's unauthorized teaching of sex education and her prohibited use of mass punishment. The administrative investigation was conducted by Carrol Mouton, the principal of Acadian Middle School; John Lee, Assistant Principal; and Johnny Zerangue, Director of Middle and High Schools for Lafayette Parish. Ms. Rubin was made aware of the investigation immediately and she and her attorney were invited to participate at meetings. School Board administrators, attorneys for both sides, and Ms. Rubin met on January 31 and February 16.
Written charges were made in a memorandum by Superintendent Max Skidmore dated February 28, 1990. The memorandum said:
As a result of the investigation conducted and statements taken from approximately 37% of the 137 or so students taught by Mrs. Rubin, as well as statements taken from parents of many of those same students, the complaints were presented to Mrs. Rubin, her husband, and her attorney, at a due process hearing held January 31, 1990. At the hearing, Mrs. Rubin, through her counsel, denied the complaints made against her.
The memorandum divided the charges into three parts. The first charge was:
While teaching a prescribed unit of Focus on Life Science, Chapter 6, entitled "Animal Reproduction", Mrs. Rubin, in violation of School Board policy and state law, as is prescribed in L.R.S. 17:275, instructed her students on human sexuality and further, used language and references which were totally inappropriate to the teaching of any course or subject. Examples of these complaints are Mrs. Rubin's comments in class before her students as follows:
Specific examples were then listed. They included charges that she had instructed on the composition of and use of condoms by students, and human menstrual cycles.
The second charge was that on or about October 5, 1989, and at other times, she used mass punishment for infractions of a few students. The third charge was that she made threats of reprisal against students if they told about how she conducted her classroom teaching.
The memorandum then recited:
Except for the dates indicated hereinabove, we do not have specific dates for the infractions indicated, but believe that they occurred in either late December, 1989, or early January of this year [1990]. The first complaint made about this matter came from a parent and was dated January 9, 1990. Complaints from the students followed thereafter.
*1018 Attached to the memorandum containing the charges were the names of over 50 students and parents, names and addresses of every person the Superintendent might call as a witness, a list of all students in Ms. Rubin's classes, and copies of the 37 written statements.
The hearing of the charges was delayed because Ms. Rubin filed a petition with the Fifteenth Judicial District Court for an injunction to keep the Board from hearing the charges. This petition was heard and denied.
The teacher tenure hearing was then set for May 29. When the hearing began she made no objection to the hearing on that date and did not ask for a continuance. The hearing was a public one, as she requested. It was presided over by the President of the School Board. An attorney selected by agreement of the parties was hired by the Board to be present and rule on evidence questions.
Ms. Rubin was represented by attorneys throughout. She subpoenaed all 137 of her students at Acadian Middle School. She called every witness she wanted to. She was allowed full cross-examination of the witnesses called by the superintendent. She did not then and does not now assert that there was any evidence she was kept from introducing.
At the conclusion of the hearing each of the fourteen School Board members was given a ballot, asking for a response as to whether each specified charge was proved or not proved. A second ballot let the member vote on whether the member thought her conduct, whatever was proved, amounted to incompetence or willful neglect of duty or both. A third ballot asked for a vote for, or against, termination.
A majority of the Board found that the teacher was guilty of instructing students on human sexuality by commenting in class on the construction of and use of condoms by students and by commenting in class on human menstrual cycles. A majority also found she was guilty of using mass punishment for the infractions of a few students. A majority of the Board then found that this was willful neglect of duty, and voted to terminate her employment. Ms. Rubin's dismissal was appealed to the Fifteenth Judicial District Court and upheld.
Three judges of this five-judge court have decided to reverse. Although one of the opinions of this majority espouses Ms. Rubin's version of the facts as being correct, as I appreciate the decision of the majority the reversal is not on the facts, but rather on their belief that the School Board failed to follow the requirements of the teacher tenure law in conducting the hearing, and failed to accord Ms. Rubin due process. Except to say that the majority opinion's narration of Ms. Rubin's version of events is not supported by the record,[1] I will not burden this dissent with an unnecessary discussion of the substantive facts of this case. The judges with whom I disagree recognize that *1019 our standard of appellate review in tenure cases is limited to assessing whether a board has a rational basis for the determination supported by substantial evidence, and they concede, albeit somewhat critically, that we cannot decide the case by making a de novo examination of the record evidence. They rest their decision upon the proposition that Ms. Rubin was not accorded the process due her under Section 443 of the General School Law.
It is significant that the majority of three judges on this panel who have decided to reverse make up a majority of three on only one issue: they believe that there was a violation of Section 443(B) because the ballot failed to give the Board some lesser option of discipline besides termination. Neither of the opinions favoring reversal explain how Section 443 was violated by the ballot. They cite no cases and give no reasons. They simply make a quantum leap from the statute's recognition of a school board's authority to either remove a teacher from office, or discipline the teacher, to a finding that the absence of some form of alternative discipline on the ballot somehow deprived the teacher of due process.
I strongly disagree with this decision. On the charges that were presented by the Superintendent to the School Board in this case, there were but two options appropriate: they were whether the teacher would be terminated, or not. Those were the options presented to the Board on the third ballot.
To say that the School Board was unaware that it did not have to terminate Ms. Rubin is to presume that these School Board members were not reasonably intelligent and had to be led by the hand. The record shows that they were fully aware of their options. The Board members had heard testimony by her principal, Mr. Mouton, that he did not recommend termination; but rather, he recommended a transfer. They had heard testimony that the options were discussed before the charges were made and that Superintendent Skidmore made the recommendation to terminate. Indeed, in the very foundation of these proceedings, Superintendent Skidmore wrote in his Section 443(A) notice:
I cannot recommend transfer of Mrs. Rubin to another teaching position or to a non-teaching position within the school system because I firmly believe that if the charges herein are accurate, she is not fit to work within our educational system and is guilty, in my opinion, of willful neglect of duty and incompetence as a teacher. It is my further belief that no degree of remediation on the part of Mrs. Rubin would correct the complaints involved.
These School Board members had enough sense to understand that if Ms. Rubin should be dealt with by some means short of removal from office, all they had to do was vote "no" on the ballot sheet. It is hard for me to see how this teacher was deprived of due process by this ballot.
I add this observation: if Section 443(B) is interpreted as requiring that the ballot could have complied with the teacher tenure law only by offering "other punishment options", how will school boards hereafter administer such a rule? Is a written verdict now to be required? How many other punishment options are there? Who makes the list? If Superintendent Skidmore had written down all he could think of on the ballot sheet, but the very one this teacher thought was particularly appropriate to her case was not there, would that omission have been a violation of the Section? These questions raise insuperable problems for school boards handling tenure cases. In this case the Board chose to give Ms. Rubin the benefit of a written ballot for voting. She had the most favorable ballot that could have been devised for her case.
In my opinion, Ms. Rubin's constitutional rights were solicitously honored throughout. The due process contentions raised on appeal are without merit. Only one, the purported violation of Section 443(B), is believed valid by more than two members of this five-judge panel.
I dissent also from the action of this court in reversing and ordering reinstatement. I emphasize that the only basis for reversal agreed to by a three-judge majority of this five-judge court is the failure of the Board to consider other options besides termination. Even if the reversal is correct as a matter of law, the most that this court has the *1020 authority to do is remand for reconsideration by the Board of whether to remove Ms. Rubin or discipline her by some means short of termination. West v. Tangipahoa Parish School Board, 615 So.2d 979 (La.App. 1st Cir.), writ denied 618 So.2d 414 (La.1993); Johns v. Jefferson Davis Parish School Board, 154 So.2d 581 (La.App. 3rd Cir.1963). It is not within the competence of this court to reverse outright and order reinstatement.
WOODARD, Judge, dissenting.
Plaintiff first argues that she did not receive proper notice of the charges against her. She claims (1) the memo from Superintendent Skidmore is not a written and signed statement of the charges, as required by La.R.S. 17:443; (2) there is no evidence in the record that she received a copy of the written charges against her; and (3) there is no evidence that the School Board authorized Superintendent Skidmore to furnish plaintiff with a copy of the charges against her.
La.R.S. 17:443 provides in pertinent part as follows:
"At least twenty days in advance of the date of the hearing, the superintendent with approval of the school board shall furnish the teacher with a copy of the written charges. Such statement of charges shall include a complete and detailed list of the specific reasons for such charges and shall include but not be limited to the following: date and place of alleged offense or offenses, names of individuals involved in or witnessing such offense or offenses, names of witnesses called or to be called to testify against the teacher at said hearing, and whether or not any such charges previously have been brought against the teacher."
This information which must be provided enables the teacher to know exactly what the alleged facts are that form the basis of the proceedings against her so she can prepare her defense accordingly. Cunningham v. Franklin Parish School Bd., 457 So.2d 184 (La.App. 2 Cir.), writ denied, 461 So.2d 319 (La.1984).
The charges against plaintiff are listed in detail in a memo from Superintendent Skidmore to all Board members, dated February 28, 1990. The memo notes that a copy was also sent to plaintiff. Superintendent Skidmore's initials are signed next to his name on the memo, thus, the memo is a signed copy of the written charges against plaintiff. Dates for the charges are indicated to the extent that they were known, and a list of potential witnesses was attached to the memo.
Plaintiff claims there is no evidence that she received a copy of the written charges against her. She is not claiming that she did not, in fact, receive the memo, only that there is no evidence that she did. The memo states that a copy was being furnished to plaintiff. There is no evidence in the record of any objection by her either prior to or during the hearing, on the ground that she never received a copy of the charges; all of plaintiff's objections were based on alleged defects in the written charges. Plaintiff and her attorney were present at the hearing with a well-prepared defense.
Plaintiff also argues that there is no evidence that the School Board authorized Superintendent Skidmore to furnish plaintiff with the list of charges against her. Because the charges were set out in a memo by Superintendent Skidmore to the School Board, the copy that was sent to plaintiff was apparently not done with the School Board's prior approval. However, as noted earlier, the purpose of the procedure set out in La. R.S. 17:433 is to provide a teacher with sufficient notice so the teacher can adequately prepare a defense. There is no evidence in the record that the apparent failure of Superintendent Skidmore to obtain the School Board's approval before sending a copy of the charges to plaintiff resulted in any prejudice to plaintiff. See Fleming v. Concordia Parish School Board, 275 So.2d 795 (La.App. 3 Cir.), writ denied, 279 So.2d 204 (La.1973). Therefore, this defect does not constitute reversible error.

Expansion of Charges
Plaintiff argues that the charges against her were expanded at the hearing when written statements of some of her witnesses were admitted into evidence. She claims the statements make reference to issues of race *1021 and religious beliefs and, thus, constitute an expansion of the charges against her.
A review of the record reveals that plaintiff was only charged with those items listed in the February 28, 1990 memo. The Board members voted on each of these charges and nothing else. After a full hearing, a majority of the Board found plaintiff committed four of the listed charges. None of the listed charges had anything to do with race or religious beliefs.

Discovery
Plaintiff contends she was denied the right to cross-examine her accusers because the School Board refused to issue deposition subpoenas to each student in her seventh grade science class and to each adult listed as a potential witness. Plaintiff also argues she was deprived of pre-hearing discovery because the Board did not respond to interrogatories she submitted or to her motion to disclose favorable evidence.
The district court addressed these issues on May 16, 1990, when it ruled on plaintiff's requests for a preliminary injunction and a declaratory judgment. The court found that La.R.S. 17:443 provided adequate safeguards for plaintiff's procedural due process rights and that the Code of Civil Procedure's rules regarding discovery do not apply to cases arising under the Teacher Tenure Law.
Federal due process only requires that plaintiff be given notice and an opportunity to be heard. Franceski v. Plaquemines Parish School Bd., 772 F.2d 197 (5th Cir.1985), citing Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Any other procedural rights to which plaintiff is entitled are provided in Louisiana's Teacher Tenure Law. Franceski, supra. The Teacher Tenure Law does not grant plaintiff the right to pre-hearing discovery. Thus, there is no error in the Board's failure to issue deposition subpoenas and failure to respond to other discovery requests. Plaintiff was not denied the right to cross-examine her accusers. At the hearing, plaintiff cross-examined the witnesses against her and presented witnesses and evidence on her own behalf.

Compulsory Process
Plaintiff claims she was deprived of meaningful compulsory process because she had to prepare and serve subpoenas for each of the 137 children in her seventh grade science classes.
Louisiana's Teacher Tenure Law provides at La.R.S. 17:443(A) in pertinent part:
"For the purpose of conducting hearings hereunder the board shall have the power to issue subpoenas to compel the attendance of all witnesses on behalf of the teacher."
The School Board validated the subpoenas, but plaintiff had to prepare them first, and then have them served. La.R.S. 17:443 contains a grant of power to school boards to issue subpoenas; the statute does not require a school board to issue subpoenas requested by a teacher. This is a discretionary power granted to the Board. Plaintiff requested the issuance of 137 subpoenas. Given the onerous burden of such a request, it was reasonable for the School Board to decline to incur the enormous expense of preparing and serving the subpoenas. Furthermore, the subpoenas were, in fact served on the students. Most of these students were present for the hearing. Plaintiff has not been prejudiced.

Ballot and Voting Procedure
Plaintiff argues that the ballot used by the Board was improper. In State ex rel. Franceski v. Plaquemines Parish School Bd., 416 So.2d 150, 155 (La.App. 4 Cir.), writ denied, 421 So.2d 907 (La.1982), the court concluded that the school board must vote on each of the specific charges against the teacher. The first page of the ballot in the case sub judice set forth each of the charges against plaintiff for each Board member to vote on. A majority of the Board voted affirmatively on four of the listed charges. The second page of the ballot required the Board members to vote on whether plaintiff was guilty of incompetency or willful neglect of duty. Nine of the fourteen Board members found plaintiff guilty of willful neglect of duty. The final page of the ballot required Board members to vote on whether plaintiff's employment with the Lafayette Parish *1022 School Board should be terminated. Nine of the fourteen Board members voted in favor of terminating plaintiff's employment.
Plaintiff argues that one Board member's vote for dismissal should be disregarded because the member did not find plaintiff guilty of willful neglect of duty, but still voted to terminate plaintiff's employment. This Board member voted to dismiss plaintiff on finding plaintiff guilty of incompetence. Even if this Board member's vote is disregarded, a majority of the Board still found plaintiff guilty of willful neglect of duty and voted that she be dismissed. All that is required is a majority vote on one of the grounds. Summers v. Vermilion Parish School Bd., 493 So.2d 1258 (La.App. 3 Cir.), writ denied, 497 So.2d 312 (La.1986); Franceski, 416 So.2d at 153.

SUBSTANTIVE ISSUES
Generally, the issue presented by plaintiff's remaining assignments of error is whether the action of the School Board in dismissing her was supported by substantial evidence. The standard of judicial review of a school board's action is "whether there is a rational basis for the board's determination supported by substantial evidence insofar as factually required." Howell v. Winn Parish School Board, 332 So.2d 822, 825 (La.1976). The reviewing court may not substitute its judgment for the judgment of the school board or interfere with the board's bona fide exercise of discretion. Id. The action of the school board should be reversed only if it is found to be arbitrary, capricious, or an abuse of discretion. West v. Tangipahoa Parish School Bd., 615 So.2d 979 (La.App. 1 Cir.), writ denied, 618 So.2d 414 (La.1993). Certainly, credibility of the witnesses becomes an issue and the determination of which should not be supplanted absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La. 1989).
After a thorough review of the record, it is evident that the School Board had a rational basis for its decision to terminate plaintiff's employment. There is substantial evidence supporting the Board's conclusions. Numerous students from plaintiff's seventh grade classes testified at the hearing about plaintiff's inappropriate references to sex. Many of these students testified that plaintiff discussed condoms and human menstrual cycles. These topics were not discussed pursuant to a human sex education curriculum. Before sex education can be taught, the course must be authorized by the school board and all books and materials must be approved by the school board and a parental review committee. La.R.S. 17:281. Such a course was not authorized for Acadian Middle School, where plaintiff was teaching.
Students also testified that plaintiff gave mass punishment for the infractions of a few, which was supported by teacher evaluations of plaintiff contained in the record.
Although plaintiff denied all of the charges at the hearing, the Board was in the best position to judge the credibility of the witnesses, see Rosell, supra, and apparently believed that plaintiff's infractions were so egregious that no action short of dismissal was appropriate.
NOTES
[1] All who testified confirmed, throughout her long teaching career, Bernadette Rubin distinguished herself in the profession and her personnel record reflects overall satisfactory ratings.
[2] Rubin acquired a B.S. and a Masters Degree in Elementary Education.
[3] In January, 1990, he appointed Rubin to serve on this committee.
[4] At the termination hearing, Lee denied handing Rubin any note; but, when deposed following Rubin's dismissal, Lee admitted he in fact delivered the message to Rubin.
[5] With interest, we further note several students, particularly those in 7th hour, were not performing well in Rubin's class and they earned grades of "D" or below. These students later voiced the most complaints and led the march, joined by their parents, to oust Rubin from her employment.
[6] In the February 28, 1990 memo prepared by the Superintendent, only the charge in Section 2 with Subparts A through M was mentioned. Section 1 was not separately identified. In the ballot used by the Board to record their vote, however, Section 2 was divided into two separate charges.
[1] For example, Footnote # 5 of the majority opinion incorrectly attributes the "march" to "oust Rubin" to students, particularly those in the seventh hour, who were making bad grades. The facts are, of the 107 students whose grades appear on pages 2001-2005 of the record, the average grade in all five sections is just below a "C". The average grade of Ms. Rubin's witnesses was slightly over a "C", while the average grade of the witnesses called by Superintendent Skidmore was slightly under a "C", which was the average of all of her sections. Only five of the forty-five students testifying were from the seventh hour class. One of these was the teacher's witness. The grades of the remaining four were an "A", an "F", a "C", and a "D", averaging, like all her students, just under a "C". There is no substantiation in the record for saying that the students making the worst grades voiced the most complaints. Nor is there any substantiation in the record that any students led any march to oust anybody.

Another error of fact is the observation that statements authored by students and their parents were disseminated to Board members in a packet prior to the hearing. The only evidence in the record touching on this subject is the deposition of Marguerite Lyle, a School Board member. She was asked by Ms. Rubin's attorney if she received a packet before the hearing with evidentiary information in it on Ms. Rubin. She responded that she received the usual packet before every meeting and could not remember its contents, but she did not believe that it contained any evidentiary information. This is the only evidence in the record on this subject, and it certainly does not justify a finding that the School Board was given evidence to peruse before the hearing began.