FREDERICKA HOMBERG WICKER, Judge.
 

 12This is a civil service disciplinary case. Former City of Kenner firefighter Alvin Langsford appeals the judgment of the Twenty-Fourth Judicial District Court which vacated the Kenner Municipal Fire and Police Civil Service Board’s decision to reinstate Mr. Langsford as a Kenner firefighter and maintained Mr. Langsford’s termination proscribed by the City of Ken-ner, the appointing authority.
 
 [1]
 

 
 *475
 
 Mr. Langsford specifies two errors to the proceedings below. First, Langsford contends that the district court was manifestly erroneous in reversing the civil service board’s decision by misapplying the standard of review set forth in La. R.S. 33:2501(E)(3). Second, in the event that his employment is found to have been properly terminated, Langsford contends that the district court was manifestly erroneous in failing to hold that he was denied his constitutional due process rights. For the reasons that follow, we affirm the judgment of the district court.
 

 | .PROCEDURAL HISTORY
 

 On September 12, 2005 Kenner Fire Captain David Schilling wrote two reports to Fire District Chief Larry Negrotto concerning Mr. Langsford’s conduct on September 3 and September 9, 2005. These incidents involved a September 3, 2005 incident wherein Mr. Langsford allegedly brandished a gun, a September 9, 2005 incident wherein Mr. Langsford allegedly was out of uniform and a September 9, 2005 incident in which Mr. Langsford allegedly abandoned his post. On September 13, 2005 Mr. Langsford was relieved of duty without pay until further notice. Thereafter, on October 4, 2005, Mr. Langs-ford’s attorney wrote to Kenner Fire Chief Michael Zito demanding the Kenner Fire Department give reasons for its actions taken against Mr. Langsford. On October 21, 2005 Fire Chief Zito notified Mr. Langsford that his “Firefighter Meeting” was scheduled on October 24, 2005. This meeting, characterized by the City of Ken-ner as a “Pre-Disciplinary Conference,” took place as scheduled. Attending in person were Fire Chief Zito, Kenner Chief Administrative Officer Philip Ramon, Ken-ner firefighter and Civil Service Board member Michael Giarrusso, and Mr. Langsford. Mr. Langsford’s counsel attended by phone. At the conclusion of Chief Zito’s presentation Mr. Langsford was given an opportunity to respond. He did so by letter dated October 28, 2005. On November 16, 2005 the City of Kenner terminated Mr. Langsford effective that day.
 

 Chief Zito informed Mr. Langsford in the termination letter that he was being terminated for three incidents, a September 3, 2005 incident which involved a firearm, a September 9, 2005 incident which involved Mr. Langsford being out of uniform and a September 9, 2005 incident which involved leaving his post without authorization. According to the letter, the City also took into | consideration the fact that Mr. Langsford had previously been terminated on from his position on November 22, 2004. At that time, Langsford was a fire captain and had been a member of the Kenner Fire Department for approximately 21 years. Langsford was terminated from his position for harassing and ridiculing subordinates, exposing the City of Kenner to legal liability, and demoralizing his platoon. The City of Kenner subsequently reinstated Mr. Langsford following his November 22, 2004 termination. The City of Kenner and Mr. Langsford executed a Reinstatement Agreement in anticipation of Mr. Langsford’s return to the Kenner Fire Department. Under the terms of the Reinstatement Agreement, Mr. Langsford was demoted to the rank of firefighter and ordered to serve a 45-day suspension without pay. However, Mr. Langsford was allowed to retain his departmental seniority.
 

 Mr. Langsford appealed his November 16, 2005 termination to the Civil Service Board. Michael Giarrusso, the Kenner firefighter and member of the Civil Service Board who attended the Pre-Disciplinary
 
 *476
 
 Meeting with Mr. Langsford, recused himself from the Civil Service Board’s proceedings. The remaining four members of the Civil Service Board heard Mr. Langs-ford’s appeal on May 15, 2006 and June 27, 2006. Multiple witnesses testified and many documents were introduced into evidence on those two dates. After deliberating, the Civil Service Board was unable to make a decision by the concurrent votes of three members as required by La. R.S. 33:2501(D). Accordingly, the Civil Service Board affirmed the City of Kenner’s action. Mr. Langsford appealed the Board’s decision to the district court. While that appeal was pending the Civil Service Board vacated its decision and agreed to hear the matter again with a reconstituted Board of five members.
 

 IfiOn October 1, 2008 the reconstituted Civil Service Board took up this matter again. The Board agreed to hear the matter based upon the 2006 testimony. After hearing the parties’ arguments the Board went into executive session. On that date the Civil Service Board unanimously found that the appointing authority acted “[in an] arbitrary and capricious [manner] and without cause in the termination of A1 Langsford with regard to the three incidents in his personnel action form dated November 16, 2005.” The Civil Service Board thereby rescinded Mr. Langsford’s termination. The Civil Service Board made the following findings of fact:
 

 Gun Incident: His actions were not inappropriate considering the exigent circumstances in the aftermath of Huri’icane Katrina
 

 Uniform: His actions were not inappropriate considering the exigent of circumstances in the aftermath of Hurricane Katrina
 

 Abandonment of Post: Did not abandon post. Pie called dispatch and informed his captain he was leaving.
 

 On October 16, 2008 the City of Kenner filed its appeal from the Civil Service Board’s decision in the Twenty-Fourth Judicial District Court. On October 20, 2008 the Civil Service Board amended its findings to indicate the vote was two members to affirm the City of Kenner’s action and three votes opposing the City’s action against Mr. Langsford.
 

 By judgment dated April 9, 2009, the trial court vacated the Civil Service Board’s decision and maintained the discipline proscribed by the appointing authority. In his reasons for judgment, the trial court found that the Civil Service Board’s decision was not made in good faith for cause. The trial judge opined that the Civil Service Board hears and determines if the appointing authority was arbitrary and capricious regarding its disciplinary action. The court opined that the Civil Service Board acted beyond the scope of its authority and substituted its own ■Judgment for that of the appointing authority. The trial court noted that it is charged with the duty to determine whether the Board’s decision was in good faith for cause and should only overturn the decision of the board if the Board was manifestly erroneous. The trial court additionally noted:
 

 The Kenner Fire Department had a rational basis to terminate Mr. Langsford. Furthermore, because several Board members voted to uphold the appointing authority’s discipline, it stands to reason by definition the appointing authority could not have been arbitrary and capricious.
 

 The trial court concluded that the Ken-ner Fire Department did not act arbitrarily and capriciously in disciplining Mr. Langsford. Mr. Langsford timely filed this appeal.
 

 
 *477
 
 FACTS
 

 The relevant facts underlying the instant appeal took place shortly after Hurricane Katrina made landfall in southeastern Louisiana on August 29, 2005.
 

 The Firearm Incident
 

 On September 3, 2005, the crew of Engine 378 was returning to the fire station with Captain David Schilling in command. Mr. Langsford was a firefighter on Engine 378 at the time. Rhonda Knowles, Randy Ayo, and Lee Stoltz were also aboard Engine 378 at the time. Mr. Ayo had brought his revolver on the fire truck for protection.
 
 [2]
 
 As Engine 378 arrived at a red light on Loyola Avenue, Mr. Langsford saw three men fighting in the parking lot of a gas station. One of the men allegedly had a lead pipe. At the Civil Service Board hearing, Ms. Knowles testified that Mr. Langsford yelled for the truck to stop. However, Mr. Langsford denied yelling for the truck to stop.
 

 Mr. Langsford testified at the hearing that he “asked” Mr. Ayo for his pistol after the fire truck had stopped because he was concerned about the situation. Ms. 17Knowles testified that Mr. Langsford screamed “give me the gun, give me the gun” at Ayo. Mr. Ayo gave Mr. Langsford the pistol. Mr. Langsford thereafter jumped out of the fire truck and walked towards the men who were fighting. Mr. Langsford yelled at the men and told them to stop fighting. During the Civil Service Board hearing, Mr. Langsford testified that he told two of the men to proceed in one direction and the other man to proceed in the opposite direction. Mr. Langsford admitted that he did not know whether the men who were fighting had guns when he began walking towards them.
 

 It is not clear from the record whether Mr. Langsford pointed the pistol at the men who were fighting. During his deposition, Mr. Langsford testified that the gun was in his right hand and was “plainly visible to the assailants so that they would know we were armed.” Mr. Langsford further testified that he pointed at the men with his left hand and told them to disperse. At the Civil Service Board healing, Mr. Ayo testified that Mr. Langsford did not point the gun at the three men. In its findings of fact, the Civil Service Board determined that Mr. Langsford pointed the gun at the men. The parties do not dispute that Kenner Police Department officers arrived seconds after Mr. Langsford displayed the pistol or that Engine 378 thereafter returned to the station without incident.
 

 At the Civil Service Board hearing, Ms. Knowles testified that she was not comfortable when Mr. Langsford drew the pistol. Conversely, Mr. Stoltz testified that he “had no problem with [Mr. Langsford drawing the pistol].” Similarly, Mr. Ayo testified that he gave Mr. Langsford his pistol because he knew that Mr. Langsford had previous military training. Ms. Knowles testified that although she was not troubled by firefighters carrying weapons for self-protection, she was not comfortable with Mr. Langsford drawing the pistol.
 

 |sMs. Knowles further testified that her concerns about Mr. Langsford’s conduct were exasperated after the firearm incident. According to Ms. Knowles, firefighters in the station house frequently discussed the lawlessness reported by the media in the aftermath of Hurricane Katrina. Ms. Knowles testified that Mr. Langs-ford told her “if someone walks past this station we will shoot them, throw a rock at the station, at the window and say they were breaking in.” Ms. Knowles indicated
 
 *478
 
 her concern to Captain Dennis Crocker and told him that she was uncomfortable being at the station with Langsford unless a member of command was present.
 

 Captain Schilling, Mr. Langsford’s direct supervisor, met with Mr. Langsford several times after the incident. According to Captain Schilling, he told Mr. Langsford that it was never appropriate to “pull a weapon on a citizen.” Mr. Langs-ford acknowledged during the Civil Service Board hearing that Captain Schilling told him he had acted inappropriately in drawing the gun. Schilling reported the firearm incident to his supervisor Fire District Chief Larry Negrotto. On September 12, Schilling created a written report regarding the firearm incident and noted that his report was meant to document the verbal report he made to Chief Negrotto. The September 12 report indicates that Mr. Langsford got off the truck and aimed a revolver at the three citizens. The report further indicates that Schilling had a “firm talk” with Mr. Langsford and that Schilling feared for the safety of his crew during the firearm incident.
 

 Capt. Schilling testified before the Civil Service Board about the firearm incident, however, the testimony was not transcribed due to radio interference. The secretary of the Civil Service Board took the following notes during Capt. Schilling’s testimony:
 

 [i,The fire truck was on Loyola going south. He heard stop the truck. The truck stopped. A1 Langsford had a weapon going toward three individuals. The men were getting ready to fight. One had a lead pip [sic] and it was lifted. Within ten seconds the Police Department arrived. Lee Stoltz, A1 Langsford, Rhonda Knowles, and Randy Ayo were the firemen on the truck.
 

 The November 16, 2005 termination letter noted that Mr. Langsford’s actions during the firearm incident “jeopardized the safety of the entire crew and could have resulted in serious injury to the crew.”
 

 The Uniform Incident and the Abandonment Incident
 

 On September 8, 2005, Mr. Langsford became dehydrated while fighting a fire. Mr. Langsford received medical attention at East Jefferson Memorial Hospital. His immediate supervisor, Captain Dennis Crocker, thereafter placed Mr. Langsford on “rest and relaxation time” (“R & R”).
 

 The parties do not dispute that firefighters on R & R were “second responders,” meaning that they would have to respond to a dispatch if first responders were not available. In addition, the parties do not dispute that Kenner’s R & R policy was not written down and that the policy was only instituted after Hurricane Katrina.
 

 However, the parties strenuously dispute under what conditions firefighters on R & R were permitted to leave the fire station, if at all. Crocker testified during the Civil Service Board hearing that firefighters on R & R “were able to leave, under my understanding, once they notified their officer that they were, their supervisor that they were leaving, which would be the captain of the station.” Chief Negrotto agreed but added that firefighters also had to “call out” by informing their dispatcher that they were leaving the station. Chief Negrotto testified if a firefighter wanted to leave for an extended length of time, he would have to clear it with his immediate supervisor. Chief Negrotto additionally noted that if a firefighter wanted to leave for an extended period, he would be due back at l,flthe station at his next regular tour of duty. Captain Mike Dunn testified that immediately after Katrina, firefighters only had to inform their captains that they were going
 
 *479
 
 on R & R. According to Captain Dunn, as the R & R policy developed, supervisors began requiring firefighters to call out to leave the station. Dunn also indicated that each captain handled the R & R policy differently. Deputy Chief Brian McKnight testified that if a firefighter wanted to take a short amount of time to attend to personal matters, he could do so by advising his captain. However, if a firefighter wanted to take more time off, he would have to “clock out,” meaning he would not be paid for that time. Mr. Langsford testified that if a firefighter wanted to leave for less than two hours, he would have to call out but would be paid for the time. However, if a firefighter wanted to leave for more than two hours, he would have to call out and inform his captain. Mr. Langsford additionally indicated that if a firefighter wanted to leave for more than two hours, he would not be paid for that time. Assistant Chief Roy Gautreaux testified if a firefighter wanted to leave during his shift, he would have to inform his captain. According to Chief Gautreaux, before the firefighter could leave, the firefighter’s captain would then have to obtain permission from his supervisor.
 

 On the morning of September 9, 2005, Chief Negrotto observed Mr. Langsford wearing an LSU shirt, camouflage pants, and a hat in the fire station. Chief Neg-rotto immediately informed Mr. Langsford that he needed to change into clothes that would properly identify him as a fireman. Chief Negrotto testified that Kenner firefighters were not required to observe full uniform dress during Katrina’s aftermath due to clothing shortages and laundry problems. However, Chief Negrotto believed that it was important that the firefighters wear something identifying them as such. Chief Negrotto testified that many firefighters were wearing Kenner Fire Department T-shirts.
 

 InMr. Langsford told Chief Negrotto that he was on R & R time and did not have any appropriate clean clothes to wear. Chief Negrotto told Mr. Langsford that his being on R & R merely meant that he would be a second responder rather than a first responder.
 

 At approximately 4:00 PM on September 9, Chief Negrotto saw Mr. Langsford at the fire department’s fuel depot. Mr. Langsford was still wearing the LSU shirt, camouflage pants, and the hat that he had been wearing that morning. Chief Neg-rotto again told Mr. Langsford that he had to change into more appropriate clothes. Chief Negrotto thereafter had a conversation with Fire Chief Larry Zito about Chief Langsford’s conduct. Negrotto testified that Chief Zito wanted to “knock Langsford off the clock.” Chief Zito allegedly told Chief Negrotto that he wanted Chief Negrotto to relieve Mr. Langsford of duty. Chief Negrotto then talked to Assistant Chief Mike Michel about relieving Mr. Langsford of duty. Chief Negrotto asked Michel “to go down to the station with me in case there was trouble.” Chief Michel told Mr. Langsford that he was not going to relieve Mr. Langsford and that he would talk to Chief Zito. Afterwards, Chief Negrotto told Mr. Langsford that a decision was being made as to whether or not to send Mr. Langsford home. At the Civil Service Board hearing, Chief Negrotto indicated that he considered Mr. Langsford to be a danger to other members of the Kenner Fire Department “under the right circumstances.”
 

 At approximately 9:00 PM on September 9, Mr. Langsford left the fire station and returned home. The parties do not dispute that Mr. Langsford left his post. The parties do dispute the circumstances surrounding Mr. Langsford’s departure. During the Civil Service Board hearing,
 
 *480
 
 Mr. Langsford alleged that he informed Schilling that he had to leave, called out to his dispatcher, and went home 112pursuant to the R&R policy.
 
 [3]
 
 Mr. Langsford further testified that he went home because he had learned that his elderly aunt had not survived Hurricane Katrina. Mr. Langsford admitted that he did not tell Schilling that he was leaving because his aunt had passed away. According to Mr. Langsford, Captain Schilling had no response when he told Captain Schilling that he was clocking out.
 

 Captain Schilling testified that Mr. Langsford had previously become aware that his supervisors were contemplating whether to discipline him for the firearm incident and the uniform incident. According to Captain Schilling, Mr. Langs-ford told him “[i]f they can’t make up their mind, I’ll make it up for them” and left his post. Captain Schilling confirmed that Mr. Langsford did not mention that his aunt had died. Mr. Langsford denied telling Captain Schilling “[i]f they can’t make up their mind, I’ll make it up for them.”
 

 Captain Schilling made a report after the abandonment incident. The report indicates that “[Mr. Langsford] packed up his belongings and called out. He did not wait for the authorization from a chief officer to leave. After he left, I informed D/C Negrotto.” The station log similarly indicates that on 9:19 PM “FF Langsford called out. He was informed that a decision was being made as to whether he would be sent home. He made the decision to leave without authorization from a chief officer.”
 

 The Civil Service Board’s secretary took the following notes during Captain Schilling’s testimony:
 

 R&R- — firefighters were put on second/and or back up truck. First truck rolled. Firefighters informed captains and could leave for a couple of hours. Langsford did inform and call out.
 

 R&R was not in writing from administration. Everyone was told of R&R.
 

 | [SMr. Langsford did not report to the station until September 13, which was the start of his next official tour of duty. After he arrived, dispatch told Mr. Langs-ford to return to his official place of residence. Mr. Langsford never again worked for the Kenner Fire Department.
 

 FIRST SPECIFICATION OF ERROR
 

 The Kenner Fire Department is a classified civil service sj'stem governed by a statutory system established by Title 33, Chapter 5, Part II, of the Louisiana Revised Statutes.
 
 See, e.g., Giarrusso v. City of Kenner,
 
 04-69 (La.App. 5 Cir. 5/26/04), 875 So.2d 872, 875. As a firefighter, Mr. Langsford is a classified civil servant.
 

 A classified civil servant is afforded protection in disciplinary actions taken without cause pursuant to La. Const. art. 10, § 8(A).
 
 See also Adams v. Jefferson Parish Department of Community Action Programs,
 
 02-1090 (La.App. 5 Cir. 4/29/2003), 845 So.2d 1147;
 
 Lewis v. Jefferson Parish Dept. of Public Works,
 
 99-16 (La.App. 5 Cir. 5/19/99), 761 So.2d 558,
 
 unit denied,,
 
 99-2906 (La.1/14/00), 753 So.2d 215. The appointing authority is charged with the operation of its department, and it is within its discretion to discipline an employee for sufficient cause.
 
 Pope v. New Orleans Police Dept.,
 
 2004-1888, p. 5 (La.App. 4 Cir. 4/20/05), 903 So.2d 1, 5-6. A dismissal of a civil servant “for cause” is synonymous with legal cause.
 
 Lewis,
 
 761 So.2d at 559. Legal
 
 *481
 
 cause for disciplinary action exists if the facts found by the commission disclose that the conduct of the employee impairs the efficiency of the public service.
 
 Id.
 
 The civil service provisions of the Louisiana Constitution are designed to protect public career employees from political discrimination, such that “ ‘non-policy forming’ public employees are selected on the basis of merit and can be discharged only for insubordination, incompetency, or improper conduct, and not for religious or | ^political reasons.”
 
 Bannister v. Dep’t of Streets,
 
 95-404, pp. 4-5 (La.1/16/96), 666 So.2d 641, 645.
 

 La. R.S. 33:2501(A) provides that a classified fire or police department employee who has been disciplined may demand a hearing and investigation by the local municipal fire and police civil service board to determine the reasonableness of the action. The Civil Service Board is vested with broad and general rulemaking and subpoena powers for the administration and regulation of the classified service, including the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, and removal. La. Const, art. 10, § 10(A)(1). The Civil Service Board may additionally make recommendations with respect to employee training and safety.
 
 Id.
 
 Moreover, the Civil Service Board has a specific duty pursuant to La. R.S. 33:2501 to hear and decide appeals by classified employees who contend that they were subjected to arbitrary and capricious discipline by command.
 

 At the hearing, the appointing authority has the burden of proving, by a preponderance of the evidence, that the complained of activity or dereliction occurred, and that such dereliction bore a real and substantial relationship to the efficient operation of the appointing authority.
 
 Cure v. Dept. of Police,
 
 2007-0166, p. 2 (La.App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094,
 
 citing Marziale v. Dept. of Police,
 
 2006-0459, p. 10 (La.App. 4 Cir. 11/8/06), 944 So.2d 760, 767. The civil service board has a duty to decide, independently from the facts presented, whether the appointing authority has good and lawful cause for taking disciplinary action and, if so, whether the punishment imposed is commensurate with the dereliction. La. R.S. 33:2561. The civil service board must also determine whether the imposed punishment was commensurate with the dereliction.
 
 City of Kenner Fire Dept. v. Kenner Mun. Fire and Police Civil Service Bd.,
 
 99-86 (La.App. 5 Cir. 6/1/99), 738 So.2d 114, 116. The Board is not free to simply substitute its judgment for that of the appointing authority.
 
 Id.
 

 An employee or the appointing authority may appeal any decision of the civil service board to the district court wherein the civil service board is domiciled. La. R.S. 33:2501(E)(1). An appeal to the district court “shall be confined to the determination of whether the decision made by the board was made in good faith for cause.” La. R.S. 33:2501(E)(3);
 
 Moore v. Ware,
 
 01-3341 (La.2/25/03), 839 So.2d 940, 945. The district court should defer to a civil service board’s factual conclusions and must not overturn them unless they are manifestly erroneous.
 
 Id.
 
 at 946. Likewise, intermediate review is limited to a finding of manifest error by the district court.
 
 Shields v. City of Shreveport,
 
 565 So.2d 473, 480 (La.App. 2 Cir.1990),
 
 aff'd,
 
 579 So.2d 961 (La.1991). Judicial review provided for by the statute does not contemplate a
 
 de novo
 
 review. Rather, the trial court sits as a reviewing court and is to look only at the record and the evidence presented to the civil service board to determine whether the board’s decision was made in good faith for cause.
 
 Lafayette City-Parish Consolidated Government v.
 
 
 *482
 

 Chauvin,
 
 04-82 (La.App. 3 Cir. 6/9/04), 875 So.2d 1023, 1029. If made in good faith and for statutory cause, a decision of the civil service board should not be disturbed on judicial review.
 
 Moore,
 
 839 So.2d at 945. Good faith does not occur if the appointing authority acts arbitrarily or capriciously, or as a result of prejudice or political expediency.
 
 Id.
 
 Arbitrary or capricious behavior means without rational basis for the action taken.
 
 Id.
 
 at 946.
 

 Accordingly, our task is to determine whether the trial court committed manifest error in reversing the ruling of the Civil Service Board. We conclude that it did not.
 

 | ir,The Civil Service Board determined that Mr. Langsford did not act inappropriately during the uniform incident or the firearm incident due to the exigencies caused by the aftermath of Hurricane Katrina. We are not unmindful of the destruction and misery Hurricane Katrina caused.
 
 See State v. All Property and Cas. Ins. Carriers Authorized and Licensed To Do Business In State,
 
 06-2030, pp. 2-3 (La.8/25/06), 937 So.2d 313, 316-17 (describing the destruction caused by Hurricane Katrina).
 

 However, in our view, the aftermath of Hurricane Katrina cannot excuse Mr. Langsford’s conduct. The record indicates that on September 3, 2005, Engine 378 stopped at a red light. Mr. Langsford asked for Ayo’s pistol, moved towards the men that were fighting at the gas station with the pistol clearly visible, and told the men to disperse. Mr. Langsford was not a police officer. He was a firefighter. He had no authority to display a weapon in such a manner, even during the chaos Hurricane Katrina produced. Moreover, there is no evidence in the record that Mr. Langsford’s fellow firefighters were in any danger when Mr. Langsford displayed the weapon.
 

 Mr. Langsford would have been well within his rights to order the men to disperse from the fire truck or to approach the men without carrying a weapon. He chose not to do so. Mr. Langsford clearly went beyond his authority as a Kenner firefighter by displaying a weapon and ordering the men to disperse. In doing so, Mr. Langsford impaired the efficiency of the public service of the Kenner Fire Department.
 

 Moreover, the record indicates that on September 9, 2005, Chief Negrotto told Mr. Langsford to change into clothes that would identify him as a fireman. Mr. Langsford chose to ignore Chief Negrot-to’s order. In our view, firefighting is a profession that requires discipline, focus, and strict obedience. Mr. Langsford |17chose to ignore those sublime principles by directly ignoring a superior officer’s order. By its very nature the refusal to obey a direct order impairs the efficient operation of a public service. This is why even single incidents of insubordination have been held sufficient to terminate a protected civil service employee.
 
 See, e.g., Almerico v. Harahan Mun. Fire and Police Civil Service Bd.,
 
 07-502 (La.App. 5 Cir. 11/27/07), 973 So.2d 799, 801 (employee disobeyed an order to take a medical exam);
 
 Danna v. Department of Transp. and Development,
 
 2008-1275 (La.App. 1 Cir. 2/13/09), 2009 WL 385581 (unpublished). Moreover, we note that Mr. Langsford was not identifiable as a Ken-ner firefighter for nearly eight hours on September 9, 2005.
 

 Mr. Langsford placed himself and the Kenner Fire Department in a potentially dangerous situation during the firearm incident. During the uniform incident, Mr. Langsford ignored a superior officer’s order and impaired the efficient operation of a public service.
 
 See also
 
 La. R.S. 33:2500
 
 *483
 
 (“the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons ... (4) Insubordination”). We believe from the testimony and the record before us that the Kenner Fire Department’s R & R policy was an
 
 ad hoe
 
 policy that was applied in a very flexible manner. We also believe that the R & R policy meant different things to different Kenner firefighters. However, it is clear from the record that Mr. Langsford refused to follow his supervisor’s orders and that he brandished a pistol on three citizens. We find that Mr. Langsford’s conduct during the firearm incident, the uniform incident, and his previous termination and reinstatement was more than sufficient legal cause for the City of Kenner to terminate his employment. We therefore find that the Civil Service Board wrongly substituted its own judgment for that of the appointing | ^authority. Accordingly, we find that the trial court was not manifestly erroneous in vacating the Civil Service Board’s ruling.
 
 [4]
 
 This specification of error has no merit.
 

 SECOND SPECIFICATION OF ERROR
 

 Langsford contends that the Civil Service Board violated principles of due process by illegally depriving him of a timely pre-deprivation notice and opportunity to be heard. We disagree.
 

 An essential principle of due process is that a deprivation of life, liberty, or property “be preceded by notice and opportunity for hearing appropriate to the nature of the case.”
 
 Mullane v. Central Hanover Bank & Trust Co.,
 
 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). The United States Supreme Court has described “the root requirement” of the Due Process Clause as being “that an individual be given an opportunity for a hearing
 
 before
 
 he is deprived of any significant property interest.”
 
 Boddie v. Connecticut,
 
 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis in original);
 
 see also Bell v. Burson,
 
 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971). This principle requires “some kind of a hearing” prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
 
 Perry v. Sindermann,
 
 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972).
 

 In
 
 Fields v. State Through Dept. of Public Safety and Corrections,
 
 98-0611, pp. 7-8 (La.7/8/98), 714 So.2d 1244, 1251, the Louisiana Supreme Court held:
 

 Generally, before a person is deprived of a protected interest, he must be afforded some kind of hearing. However, this court has often recognized there may be circumstances involving a valid governmental interest which justify postponing the hearing until after the event.
 
 In re Adoption of B.G.S.,
 
 556 So.2d 545, 553 (La.1990). A deprivation without opportunity for a prior hearing or other effective substitute safeguard has been allowed in | , ¡“extraordinary” or “truly unusual” situations.
 
 Paillot v. Wooton,
 
 559 So.2d 758, 762 (La.1990). “[E]mergency action may be proper pending a hearing when matters of public health and safety are involved.”
 
 Id.
 
 
 *484
 

 See also Wilson v. City of New Orleans,
 
 479 So.2d 891 (La.1985) and
 
 Bell v. Department of Health and Human Resources,
 
 483 So.2d 945, 951(La.),
 
 cert. denied,
 
 479 U.S. 827, 107 S.Ct. 105, 93 L.Ed.2d 55 (1986) (“[W]e note that there seems to be an emerging concept that in some instances due process is fulfilled by a ‘post deprivation’ hearing. We believe that this view to procedural due process in certain situations is sound and is in support of our decision here.”).
 

 (emphasis added)
 

 In
 
 Reed v. Department of Police,
 
 2006-1498 (La.App. 4 Cir. 10/10/07), 967 So.2d 606, the Fourth Circuit addressed an argument similar to the argument Langsford makes here on appeal. After Hurricane Katrina, Plaintiff Rashi Reed was terminated from his position as a New Orleans city police officer. He appealed to the Fourth Circuit contending that the New Orleans Civil Service Commission (“CSC”) erred as a matter of law by terminating him from his position without holding a pre-deprivation hearing.
 
 Id.
 
 at 607-08. Reed’s claim was consolidated with the claims of other New Orleans police officers alleging that CSC deprived them of due process by not providing them pre-depri-vation hearings. All of the
 
 Reed
 
 plaintiffs had previously been New Orleans police officers and all had been terminated for their conduct following Hurricane Katrina. The Fourth Circuit held that a post-deprivation hearing was sufficient to address the plaintiffs’ claims, reasoning:
 

 We can hardly envision a scenario when enforcing appropriate standards of conduct was ever more important than in the aftermath of Hurricane Katrina. In addition, we find that the CSC’s rulings relying solely on the absence of a pre-termination hearing when truly extraordinary circumstances present themselves would set a dangerous precedent on future disciplinary actions of the NOPD.
 

 Id.
 
 at 610.
 

 Several of the individual
 
 Reed
 
 plaintiffs thereafter filed writ applications with the Louisiana Supreme Court. Most of the applications were denied.
 
 See, e.g., Winford v. Department of Police,
 
 2007-2181 (La.1/11/08), 972 So.2d 1165 (plaintiff Leander Winford);
 
 Washington v. Department of Police,
 
 2007-2103 (La.1/11/08), 972 So.2d 1164 (plaintiff Errol Washington). However, the Supreme Court granted plaintiff Shawn Madison’s writ.
 
 Madison v. Department of Police,
 
 2007-2405 (La.4/4/08), 978 So.2d 288. The Supreme Court ultimately held that Madison should have been placed on medical leave rather than terminated from his position outright.
 
 Id.
 
 at 291. The court additionally noted:
 

 Like the other police officers whose writs were denied by this court, Officer Madison did challenge the court of appeal’s finding that a post-termination hearing was sufficient to protect his due process rights under the facts of this case. As we did when we denied the writ applications filed by the other officers, we reject that argument.
 

 Id.
 
 at 289 (emphasis added).
 

 We believe that the findings of the Supreme Court in
 
 Madison
 
 are dispositive here. Langsford was a civil servant working during the aftermath of Hurricane Katrina, as were the
 
 Reed
 
 plaintiffs. Langs-ford was terminated for his actions in the aftermath of Hurricane Katrina, as were the
 
 Reed
 
 plaintiffs. Langsford contends that he was deprived of due process because he was not afforded a pre-deprivation hearing, as did the
 
 Reed
 
 plaintiffs. In
 
 Madison,
 
 the Supreme Court rejected the contention that a post-deprivation hearing violated the
 
 Reed
 
 plaintiffs’ due process rights. There is no reason to suggest that
 
 *485
 
 the Supreme Court would hold otherwise here. This specification of error is without merit.
 

 CONCLUSION AND DEGREE
 

 For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are taxed to Mr. Langsford.
 

 AFFIRMED.
 

 [1]
 

 . The Kenner Municipal Fire and Police Civil Service Board will hereafter be referred to as
 
 *475
 
 the "Civil Service Board.”
 

 [2]
 

 . Apparently, this practice was not forbidden in the aftermath of Hurricane Katrina.
 

 [3]
 

 . Captain Crocker was Mr. Langsford's usual supervisor, however, Captain Crocker was home pursuant to the R&R policy at the time the abandonment incident and the uniform incident occurred.
 

 [4]
 

 . We note that the district court concluded that the Kenner Fire Department “did not act arbitrarily and capriciously in disciplining Mr. Langsford.” La. R.S. 33:2501(E)(3) provides that an employee's appeal to the district court "shall be confined to the determination of whether the decision made by the board was made in good faith for cause.” However, we agree with the district court that the Civil Service Board substituted its judgment for that of the appointing authority and that the board’s decision was not made in good faith for cause.